**SNO–WIZARD MANUFACTURING, INC., Plaintiff-Appellant/ Cross-Appellee,**

**v.**

**EISEMANN PRODUCTS COMPANY, et al., Defendants-Appellees/ Cross-Appellants.**

No. 84–3755.

United States Court of Appeals, Fifth Circuit.

June 11, 1986.

Keaty & Keaty, David M. Kelly, Thomas S. Keaty, McGlinchey, Stafford, Mintz, Cellini & Lang, Donald R. Mintz, New Orleans, La., for plaintiff-appellant/cross-appellee.

C. Emmett Pugh, Wayne A. Collier, New Orleans, La., for defendants-appellees/cross-appellants.

Before GEE, RANDALL and GARWOOD, Circuit Judges.

RANDALL, Circuit Judge:

Sno-Wizard Manufacturing, Inc., claiming that Eisemann Products Company and others violated provisions of Louisiana state law and § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), sought injunctive relief and damages from the district court. The district court found for Eisemann Products Company. Both parties appeal. We affirm.

## I.

George R. Ortolano built his first Sno-Wizard snowball machine in 1937. The Sno-Wizard snowball machine is capable of producing shaved ice for the dessert known as a snowball. The snowball consists of ice shavings, usually in a paper cone, covered with flavored syrups. The Sno-Wizard snowball machine's components include a stainless steel rectangular cabinet with a small Daytona motor mounted atop the right end. Attached to the motor is a belt running downward to a shaft connected to several blades which rotate when the motor is operating. After block ice is placed in the cabinet by the operator, a ratchet bar on the left side of the machine feeds the ice into the cutter head on the right side of the machine. When the blades cut into the ice, the shavings are discharged from a chute on the right side of the machine. The cabinet is supported by cast iron legs attached to its bottom. The door to the cabinet is also made of cast iron and has bold raised letters which read: "ORTOLANO'S SNO–WIZARD, SNO–WIZARD MFG. CO., NEW ORLEANS, LA., PATENT PENDING."

Ortolano incorporated his business in 1978 as Sno-Wizard Manufacturing, Inc. ("Sno-Wizard"), and sold the business on May 8, 1981, to Ronald Sciortino. The Sno-Wizard snowball machine was manufactured by Ortolano until the business was sold; Sciortino has continued to manufacture the machine. Although Ortolano's patent application was rejected in 1942, the door of the machine nevertheless continues to bear the words "PATENT PENDING."

In 1979, after learning that no patent was pending, Hilda J. Eisemann and Craig Collier (through Craig Collier Enterprises) (hereinafter known collectively as "Eisemann") copied the configuration of the Sno-Wizard machine. The Eisemann machine is identical to the Sno-Wizard machine except

for some minor differences in belt guards, and the language affixed to the cast iron door, which reads: "EISEMANN PRODUCTS CO, NEW ORLEANS, LOUISIANA, DIST. BY CRAIG E. COLLIER ENT."

Sno-Wizard registered its logo with the Louisiana Secretary of State on May 9, 1979, and Eisemann registered the Eisemann logo on July 25, 1983. Both machines are sold in interstate commerce, with the price of the Eisemann machine hovering at $1095, and the price of the Sno-Wizard ranging from $1395 to $1430.

Sno-Wizard filed a complaint for false representation under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), claiming that Eisemann, by selling a snowball machine with the same outward configuration as the Sno-Wizard machine, was representing its machine to be the Sno-Wizard. Sno-Wizard also alleged violations of Louisiana state law. After an evidentiary hearing, the district court denied Sno-Wizard's motion for a preliminary injunction. A trial on the merits on both the issues of liability and damages was held before the district court in May 1984. The district court dismissed Sno-Wizard's federal trade dress infringement claim, finding that the design was non-functional and non-distinctive, that the trade dress had not acquired secondary meaning, and that no likelihood of confusion had been established. The district court also found Sno-Wizard unable to prevail on its state law claims. Sno-Wizard now appeals the adverse decision to this court, and Eisemann has filed a cross-appeal addressing the district court's finding that the Sno-Wizard machine configuration was non-functional and the district court's refusal to allow Eisemann's expert witness to testify on the issue of functionality.

## II.

Section 43(a) of the Lanham Act establishes a *"sui generis"* federal cause of action for false representation.[1]  *Chevron Chemical Co. v. Voluntary Purchasing Groups,* 659 F.2d 695, 702 (5th Cir. 1981), *cert. denied,* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982). To determine whether a plaintiff has sustained a cause of action under § 43(a), we must make two inquiries: (1) whether the product configuration or trade dress qualifies for protection; (2) whether the protected product configuration or trade dress has been infringed. *See Sicilia Di R. Biebow & Co. v. Cox,* 732 F.2d 417, 425 (5th Cir.1984). The first inquiry, whether the dress qualifies for protection, encompasses the issues of functionality, distinctiveness and secondary meaning. *Id.*[2] The second inquiry, whether the protected dress has been infringed, is answered by applying a digits of confusion test to decide whether a likelihood of confusion exists. This latter inquiry is the key to finding a violation of § 43(a). We must determine "whether the defendant is passing off his goods ... as those of the

---

1. Section 43(a) provides in relevant part:
    Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

2. The doctrine of functionality acts "to separate those configurations that may be protected as property rights or trademarks and those designs that the law will not permit any person to appropriate or monopolize." *Sicilia Di R. Biebow & Co. v. Cox,* 732 F.2d 417, 422 (5th Cir.1984). "Functional" features cannot be protected.

"Stated simply, 'functionality' privileges the copying of designs or features that are functional." *Id.* If the functionality hurdle is overcome, a configuration's "distinctiveness" may qualify it for protection. If a mark or dress serves as a symbol of origin it is considered distinctive and protectable. Unless a mark or dress is deemed "inherently" or "sufficiently" distinctive, however, secondary meaning must be established. Although secondary meaning "has been variously defined, its prime element is a mental association in buyers' minds between the alleged mark and a single source of the product." *Id.* at 425 n. 4. Only when a product dress or design rises "to the level of trademark protectability— either by a showing that it is sufficiently distinctive or has acquired secondary meaning"—does the question of likelihood of confusion become relevant. *Id.* at 425.

plaintiff by virtue of substantial similarity between the two, leading to confusion on the part of potential customers." *Chevron*, 659 F.2d at 703 (quoting *Sun-Fun Products, Inc. v. Suntan Research & Development, Inc.*, 656 F.2d 186, 192 (5th Cir.1981)). The "question of remedy arises only after a court finds infringement of a

protected property interest by another product's dress or mark that will likely confuse the consuming public as to source." *Sicilia*, 732 F.2d at 425.

### III.

■ The district court found the Sno-Wizard configuration non-functional[3] and

---

**3.** In its cross-appeal, Eisemann finds fault with the district court's ruling on functionality. Eisemann first claims that the district court improperly exercised its discretion in preventing Eisemann's expert witness from testifying to the functionality of the Sno-Wizard configuration. The trial court is afforded the "widest possible discretion in deciding whether a witness qualifies as an expert." *Dixon v. International Harvester Co.*, 754 F.2d 573, 580 (5th Cir.1985). The exclusion of expert evidence is to be sustained unless manifestly erroneous. *Salem v. United States Line Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). Given the witness' lack of education beyond high school and absence of experience in the area of ice shaving machine design, the district court properly exercised its discretion.

Eisemann's main allegation is that the district court applied the wrong test to determine functionality. In finding the Sno-Wizard configuration non-functional and thus not foreclosed from trademark protection under § 43(a) of the Lanham Act, the district court explained:

> Under the Fifth Circuit's utilitarian functionality test, the ultimate inquiry is whether the configuration as protected will hinder competition or impinge upon the rights of others to compete effectively in the sale of goods.... There are numerous different snowball machine configurations which would be competitive with the Sno-Wizard machine.

Eisemann insists that the district court should have adopted a test akin to that announced by the Ninth Circuit in *Pagliero v. Wallace China Co.*, 198 F.2d 339, 343 (9th Cir.1952): if a "particular feature is an important ingredient in the commercial success of the product, the interest in free competition permits its imitation in the absence of a patent or copyright." We explicitly rejected this test of "aesthetic functionality," however, in *Sicilia*. We there endeavored to fashion a standard which would better further the Lanham Act's purpose of protecting product distinguishability. Although the *Sicilia* facts addressed the similarity of the packaging of a product, while the instant case concerns similarity between product configurations, the test announced in *Sicilia* applies to copying of product appearance as well as packaging. Indeed, there is a considerable area of overlap between a product's configuration and its packaging, as a product's appearance may function as its packaging, incorporating elements intended to dis-

tinguish it from competing products. *See* Note, *The Problem of Functional Features: Trade Dress Infringement Under Section 43(a) of the Lanham Act*, 82 Colum.L.Rev. 77, 79 (1982). Our narrow definition of functionality focused "on the utilitarian nature of a configuration or design." *Sicilia*, 732 F.2d at 428–29. "To achieve the status of 'functional,' a design or feature must be superior or optimal in terms of engineering, economy of manufacture, or accommodation of utilitarian function or performance." *Id.* at 429. A design that "merely assist[ed] in a product or configuration's utility" was not functional and could be protected. *Id.* The "ultimate inquiry," we noted, turned on whether the protection of the configuration would "hinder competition or impinge upon the rights of others to compete effectively in the sale of goods." *Id.* (quoting *In re Morton-Norwich Products, Inc.*, 671 F.2d 1332, 1342 (C.C.P.A.1982)).

Although we thus reject Eisemann's urging of the aesthetic standard of functionality, we find that the district court appears to have perhaps misconstrued and misapplied the utilitarian standard set forth by *Sicilia*. While the district court *did* consider the ultimate *Sicilia* inquiry—whether protection would hinder competition— the district court did not explicitly address the other *Sicilia* inquiries: whether the Sno-Wizard machine's design was optimal in terms of engineering, economy of manufacture, or accommodation of utilitarian function or performance.

Our review of the record in light of these inquiries would tend to support a finding of functionality. Ortolano, designer of the Sno-Wizard, testified that he designed the machine in the most effective, practical, cost-effective manner possible. Record Vol. 10 at 174–79. Sno-Wizard's expert witness, Andrew J. McPhate, admitted that many of the changes he suggested Eisemann make in its machine would have economic or functional draw-backs. Record Vol. 7 at 119, 132, 136, 139 and 140. McPhate engaged in no detailed cost analysis to compare the cost of manufacturing the Sno-Wizard to the cost of implementing the suggested changes. Record Vol. 7 at 140. However, as we uphold the district court's findings on secondary meaning and likelihood of confusion, we need not decide whether the district court erred in terming the Sno-Wizard configuration non-functional, because even if we were to conclude that the district court erred, it would not change the result of this case. *See Sicilia*, 732 F.2d at 430.

not foreclosed from trademark protection under § 43(a). The court determined that the configuration was not distinctive[4] and thus addressed whether the Sno-Wizard machine had acquired secondary meaning. As noted above, the prime element of secondary meaning is "a mental association in buyers' minds between the alleged mark and a single source of the product." *Sicilia*, 732 F.2d at 425 n. 4. The district court concluded that Sno-Wizard failed to establish secondary meaning. A finding of secondary meaning is factual and we will not overturn it unless clearly erroneous. *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 794 (5th Cir.1983).

■ We do not find the district court's determination of no secondary meaning clearly erroneous in the instant case. Sno-Wizard's evidence of secondary meaning consisted of survey data. "The authorities are in agreement that survey evidence is the most direct and persuasive way of establishing secondary meaning." *Zatarains*, 698 F.2d at 795. Of course, "to be effective at all, the survey must be carefully conducted and controlled ... so as to elicit honest and unprompted consumer reaction as to association between a given trade symbol and a single source of the product." 1 J. McCarthy, *Trademarks and Unfair Competition* § 15:13, at 690 (hereinafter "McCarthy"). Sno-Wizard conducted two surveys, one in the New Orleans area, the other in the Rio Grande Valley of Texas. Interviewers visited snowball stands, asking purchasers of snowball machines and other people who admitted to having "influence" over the purchase of snowball machines whether they could identify the Sno-Wizard configu-

ration. In the New Orleans survey, 84% of the persons surveyed (42 out of 50) identified the Sno-Wizard configuration. In the Rio Grande Valley survey, 54% of the persons surveyed (18 out of 33) identified the configuration as that of Sno-Wizard. Sno-Wizard insists that these results establish secondary meaning.

We do not agree. Of the 50 people surveyed in the New Orleans area, 43 actually operated a Sno-Wizard machine. Of the 33 surveyed in Texas, 18 owned or operated a Sno-Wizard. As the district court explained, the survey to a great extent can thus be interpreted to mean that operators of snowball machines can identify the type of machine they use each day. Indeed, in Texas, only 16% of those surveyed who did *not* own or operate a Sno-Wizard could identify the configuration. As Mr. Allen Rozensweig, designer of the survey, admitted on cross examination, there was a "tendency" of over "eighty, eighty-five percent" of interviewees to identify whatever machine they had in their snowball stands. Record Vol. 8 at 35. This "tendency" was reinforced by the fact that many of the interviews were conducted within full view of the Sno-Wizard machine and its identifying label. When asked whether interviewees could "in most instances ... look to the side at their machine to get a name off the machine," Mr. Durward Bernard, an interviewer, admitted: "yeah, if they wanted." Record Vol. 7 at 175. Given the above, we do not find the district court's finding of no secondary meaning to be clearly erroneous.

■ In any case, Sno-Wizard cannot prevail under § 43(a), for we conclude that the district court was not clearly erroneous

**4.** Sno-Wizard argues that the district court's finding of non-functionality cannot be reconciled with the district court's later observation that the machine configuration was not distinctive. We disagree. Once a design is termed functional, it can be copied freely. In fact, there is a need to copy these articles to further competition. *See In re Morton-Norwich*, 671 F.2d at 1339. Once a product is termed functional, evidence of distinctiveness will not entitle it to protection. We therefore explained in *Sicilia* that a design cannot be found both legally functional—that is, not entitled to trademark

protection—and "sufficiently distinctive" to serve as an indicator of source. 732 F.2d at 425. It does not necessarily follow, however, that a design cannot be termed non-functional and non-distinctive. A product's design could be found non-optimal and thus "non-functional" and still be considered helpful to the product's utility and not a fanciful or arbitrary trade dress. Thus we remanded the *Sicilia* case to the district court with the instruction that if the district court were to find non-functionality, it should make a "fresh finding on distinctiveness." *Id.* at 434.

in finding no likelihood of confusion. *See Sicilia*, 732 F.2d at 430 (likelihood of confusion reviewed under clearly erroneous standard). In determining likelihood of confusion, we focus on "whether the defendant is passing off his goods ... as those of the plaintiff by virtue of the substantial similarity between the two, leading to confusion on the part of potential customers." *Chevron*, 659 F.2d at 703. We look to a variety of factors, including, but not limited to: similarity of products, identity of retail outlets and purchasers, identity of advertising media, type (i.e., strength) of trademark or trade dress, defendant's intent, similarity of design, and actual confusion. *See Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.*, 725 F.2d 336, 345 (5th Cir.1984). In addition, "[i]t is often appropriate to consider the degree of care exercised by purchasers: confusion is more likely, for example, if the products in question are 'impulse' items or are inexpensive." *Id.* at 345 n. 9. The district court stated the test correctly and found that although the design and the configuration of the machines were identical except for the identifying language on the door, other factors negated any likelihood of confusion. We agree.[5]

As noted above, we have in the past indicated the importance of a finding that a defendant intended to pass off its goods as that of another in establishing likelihood of confusion: "[I]f the mark was adopted with the intent of deriving benefit from the reputation of [the plaintiff], that fact alone may be sufficient to justify the inference that there is confusing similarity." *Chevron*, 659 F.2d at 704 (quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980)). Sno-Wizard argues that the district court should have inferred Eisemann's intent and thus further inferred a likelihood of confusion from the very fact of conscious copying. "[I]ntent to deceive or to profit from confusion may be inferred from the acts of an infringer." *Falcon Rice Mill*, 725 F.2d at 346. In *Chevron*, "because we [could] think of no other plausible explanation for such behavior," 659 F.2d at 704, we found that the defendant's copying of the plaintiff's trade dress revealed the defendant's intent of "cashing in" on the plaintiff's good will. The district court here, however, explicitly found a "plausible" explanation for Eisemann's decision to copy the Sno-Wizard: Eisemann desired to provide interchangeable parts and repair the machines. Indeed, even Sno-Wizard in its brief acknowledges that Eisemann had such an intent. The district court additionally noted that "[p]rior to 1979, Mr. Ortolano delayed in sharpening blades of Sno-Wizard owners who did not purchase snowball supplies from him and Mr. Ortolano even told the owners the reason for this delay. He also delayed making repairs of those who bought supplies from his competitors." This finding too is well supported by testimony in the record. Record Vol. 8 at 199; Record Vol. 10 at 111–12; Record Vol. 10 at 139. Thus, far from trying to profit from Sno-Wizard's goodwill, Eisemann apparently tried to help those who, in the district court's words, "were victims of Mr. Ortolano's dilatory tactics." The district court's failure to find intent to pass-off is not clearly erroneous.

The district court found that the trade dress here was not a strong mark. Sno-Wizard argues that its trade dress qualifies as a strong mark through the acquisition of secondary meaning. Given the defects in the survey evidence discussed above, however, the district court's conclusion that the configuration had not acquired secondary meaning and was not a "strong" mark is

---

5. Moreover, the district court's findings on secondary meaning affect the inquiry on likelihood of confusion in the instant case. As explained by one commentator:

   [I]f the senior user has *not* obtained secondary meaning in a non-inherently distinctive mark, then another's use of that mark cannot result in buyer confusion, for buyers do not associate the mark only with the senior user. Therefore, a statement such as "in this case there is no secondary meaning in plaintiff's non-inherently distinctive term, but there is likelihood of confusion," is a non-sequitur. *McCarthy* § 15:3, at 667.

not clearly erroneous. In further assessing the trade dress at issue here, the district court also noted that confusion was unlikely in that the "origin of each machine is apparent from bold lettering appearing on each door." As explained by the Second Circuit, "the presence of its name on the product goes far to eliminate confusion of origin." *Bose Corporation v. Linear Design Labs, Inc.,* 467 F.2d 304, 309 (2d Cir. 1972). In addition, "[i]n the case of a relatively high-priced single purchase article ... 'there is hardly likelihood of confusion or palming off when the name of the manufacturer is clearly displayed.'" *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.,* 626 F.2d 193 (1st Cir.1980) (citing *Bose Corp.,* 467 F.2d at 310). It is true that the labeling of a product will not always negate a likelihood of confusion. For example, in *Truck Equipment Service Co. v. Fruehauf Corp.,* 536 F.2d 1210, 1221 (8th Cir.), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976), the court noted that "such a marketing practice by a dominant figure in the market tends to promote rather than insure against confusion." In *Truck Equipment,* however, trial testimony had indicated that the labeling caused "actual confusion in that rumors were about that [defendant] had purchased [plaintiff]." *Id.* In the instant case, trial testimony indicated that the labeling of the Eisemann machine had quite a different effect. Mr. Glenn E. Carter, introduced by Sno-Wizard as a witness to show actual confusion, admitted that the labeling of the Eisemann machine had clearly distinguished the Eisemann machine from the Sno-Wizard: "I saw that after looking at it on the door it was not a Sno-Wizard machine." Record Vol. 8 at 142.

Although we have observed that "patently the best evidence of likelihood of confusion is actual confusion," *Louisiana World Exposition, Inc. v. Logue,* 746 F.2d 1033, 1041 (5th Cir.1984) (quoting *Chevron,* 659 F.2d at 704), not all evidence proffered to show actual confusion will be deemed in fact to show such confusion. The district court found that there was no evidence of actual confusion, explicitly rejecting the deposition testimony of one witness as an interested party, and implicitly rejecting the trial testimony of three other witnesses. We do not find that the district court erred in rejecting this testimony. "The trial judge is best able to judge the credibility of a witness at trial, therefore we are reluctant to disturb this finding on appeal." *Louisiana World Exposition,* 746 F.2d at 1041. After reviewing the record, we cannot say the district court was clearly erroneous in finding no evidence of actual confusion.[6]

The record supports the district court's finding on the remaining factors. The ad-

---

**6.** The deposition testimony of Jeff Donovan revealed that Donovan was "concerned" when he saw a competitor using an Eisemann machine. Donovan Deposition at 10. Donovan indicated that he had an informal understanding with Sciortino that the Sno-Wizard would not be sold in Donovan's area. Donovan testified that the availability of the Eisemann machine had the potential to lessen his competitive edge. *Id.* at 27. Thus, Donovan had an interest against the availability of the Eisemann machine. Interestingly, insofar as Donovan's deposition testimony revealed any confusion, it was confusion caused by the designation of "PATENT PENDING" on the Sno-Wizard machine: "the patent pending did give me the assumption that the machine was made or should have been made by the same company." *Id.* at 22.

The first witness proffered by Sno-Wizard at trial, Mr. Glenn Carter, testified that he was aware of the different manufacturers of the machines after looking at their labels. His testimony thus does not establish actual confusion. The second witness, Karen Bodoin, at best gave ambiguous testimony. She first stated that she had wished to buy a Sno-Wizard machine and instead mistakenly purchased an Eisemann. Record Vol. 8 at 145. Ms. Bodoin later indicated, however, that she was "primarily interested in" a "good machine that would make the snow like snowballs," *id.* at 151, throwing into doubt her former assertion that she was seeking only a Sno-Wizard machine. Finally, the testimony of a third witness, Mr. Lee Soldani, established not that he was actually confused, but instead that he engaged in research which revealed to him the various sources of snowball machines. Record Vol. 8 at 155. Mr. Soldani's testimony fully supports the district court's conclusion that "the price of the machine is sufficiently high that a purchase without inquiry is unlikely. Confusion is more likely when a product is inexpensive or an impulse item."

**430**

vertising of both parties was admittedly minimal; the district court's conclusion that advertising did not lead to a likelihood of confusion is not clearly erroneous. The district court also found that the likelihood of confusion in the New Orleans area was mitigated by the fact that most people entering the New Orleans snowball business were familiar with both the Sno-Wizard and the Eisemann names. The record again supports this finding. Although Sno-Wizard argues that the New Orleans regional market is irrelevant, as only a small percentage of Sno-Wizard's sales were to persons in the New Orleans area, Sno-Wizard failed to introduce evidence of confusion on the national market. After consideration of all the above factors, we cannot conclude that the district court was clearly erroneous in finding that there was no likelihood of confusion as to the source of the Eisemann machine.

Finally, Sno-Wizard argues that Eisemann, in passing off its machine as a Sno-Wizard, has engaged in unfair competition under the Louisiana Unfair Trade Practice and Consumer Protection Act. La.Rev. Stat.Ann. § 51:1405(A). "Likelihood of confusion is the essential ingredient for claims of unfair competition under both the Lanham Act and the Louisiana statute." *Louisiana World Exposition*, 746 F.2d at 1039. As we above sustained the district court's finding that there was no likelihood of confusion, Sno-Wizard cannot prevail on its state law claim.

For the above reasons, the judgment of the district court is AFFIRMED.