FUDDRUCKERS, INC. and Freddie Fud-
druckers Franchising, Inc., a Texas
corp., Plaintiffs/Counterdefendants/
Appellant,

v.

DOC'S B.R. OTHERS, INC., and Arizona
corp., Douglas J. Koppes and Mary F.
Koppes, his wife; Dr. Gerald M.
Koppes, and Stephen N. Koppes, De-
fendants/Counterclaimants/Appellees.

Nos. 85–1929, 85–2394 and 85–2652.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 16, 1986.

Decided Aug. 24, 1987.

Kimball J. Corson, Phoenix, Ariz., for plaintiffs/counterdefendants/appellant.

Neil Vincent Wake, Phoenix, Ariz., for defendants/counterclaimants/appellees.

Before JAMES R. BROWNING, Chief Judge, and FLETCHER and NELSON, Circuit Judges.

FLETCHER, Circuit Judge:

Fuddruckers, Inc., appeals from a jury verdict denying Fuddruckers' claims for trade dress infringement and unfair competition under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982). We reverse and remand for a new trail.

## BACKGROUND

Fuddruckers operates a national chain of "upscale" hamburger restaurants. The restaurants serve hamburgers, hot dogs, wurst, steak, french fries, beans and jalapenos. Although its restaurants do not all have precisely the same decor, the majority of them share a great many design elements. Fuddruckers claims these design elements as its trade dress. Fuddruckers alleges that defendants Doc's B.R. Others, Inc., Douglas, Mary, Gerald, and Steven Koppes are using its trade dress wrongfully in their restaurant, Doc's B.R. Others.

The heart of Fuddruckers' design concept is that its food preparation areas are visible to its customers. In particular, the areas in which it bakes its buns, cuts its meat, and grills the food it serves are open to the public. Various food items are presented in glassed-in display cases. Another important facet of Fuddruckers' claimed trade dress is that various food items are kept in bulk in the main part of the establishment in both packaged and unpackaged forms. There are stacked cartons of beer, produce and other items in the patron areas. Iced tea is served out of a light-colored plastic 32–gallon container that looks suspiciously like a garbage can. Patrons can help themselves to melted cheese, melted cheese with jalapenos, and sauerkraut out of large, black, round crocks. Onions, lettuce, and tomatoes are available precut at a large condiment bar that also features cartons and bags of the same items uncut. Salt and pepper are served in institutional-sized containers.

The most important non-food design elements at Fuddruckers are ubiquitous two-by-four white tiles found on the walls, the bar, and the counters. Fuddruckers also

uses neon signs, many mirrors, brown and white checked flooring and tablecloths, brown director's chairs, and exterior yellow awnings.

In addition to these visual items, Fuddruckers uses a number of devices that it considers part of its trade dress. Its bakery area is labeled "Mother Fuddruckers." It uses its ceiling music system to call patrons when their orders are ready. It offers a restaurant "newspaper" to patrons at each table. Customers are allowed to buy bones for their dogs, with the proceeds going to animal shelters. There are several other less important design elements and devices that Fuddruckers also claims to be part of its trade dress.[1]

In late 1982 or early 1983, Gerald and Doug Koppes became interested in operating a Fuddruckers franchise in Los Angeles, Denver, or Phoenix. At that time, Fuddruckers owned two restaurants in Texas and had several franchises operating outside Texas. For reasons that are disputed, the Koppes [2] did not obtain a franchise. They then became interested in opening a restaurant of their own.

Fuddruckers announced in mid-June of 1983 that it had found a franchisee for New Mexico, Arizona and Colorado, and that it planned to have the first restaurant opened in Phoenix in December of that year. About the same time, with knowledge of Fuddruckers' intentions, the Koppes began plans for their own restaurant in Phoenix. There was evidence presented from which the jury could conclude that they developed the plan for their restaurant with Fuddruckers as a model.[3] The Koppes opened Doc's B.R. Others restaurant near Phoenix in early December, 1983. The Phoenix Fuddruckers opened a short time later.

Doc's has many interior features like those of Fuddruckers. *See* photographs laid out in Appendix I. The major food preparation areas are exposed and look similar to Fuddruckers'. The same shape and brand of ubiquitous white tile can be found around Doc's. Doc's also uses neon, mirrors, and director's chairs. Doc's has a newspaper like Fuddruckers, calls its bakery, "Mother Other's," and sold dog bones for a time. A number of witnesses testified that they thought the restaurants looked very much alike and the photographs in evidence support this conclusion.

Pointing to the similarities between the restaurants and the Koppes' awareness of and interest in Fuddruckers during the planning stages of Doc's, Fuddruckers claims that the Koppes intentionally copied its design, concept and style. On the other hand, the Koppes denied that they copied Fuddruckers, and there is corroborating evidence to back them up.[4]

Doc's witnesses pointed out that there are differences between the restaurants. Doc's name is prominently displayed on its directors chairs and elsewhere in the restaurant. Its checked floor is black and white rather than brown and white, and the checks are a different size. There is a very large mural and a large screen TV at Doc's

---

1. These include beer trays lined with paper used as serving platters; video games outside the restrooms; a full bar; an ice cream display case with large containers of ice cream inside; a yellow canvas awning over part of the interior to give a patio dining effect; French doors between the dining rooms; large ceiling lamps; potted floor plants; a number of black oversized napkin holders stacked on top of each other; a stainless steel bin used to dispense iced beverages; and ceiling fans.

2. We use "the Koppes" to refer to Doug and Gerald; Steven and Mary appear to have had little active role in the key events.

3. For example, there was evidence that the Koppes and their designers visited at least two Fuddruckers restaurants during the planning stages of their project. Further evidence indicated that Gerald Koppes told the bank providing money to Doc's that the closest thing to his restaurant would be a Fuddruckers, that the Koppes specifically sent their designers to Texas to look at Fuddruckers, that the business plan for Doc's described a restaurant very much like Fuddruckers, and that Doug Koppes told people that he was opening a restaurant like Fuddruckers.

4. The woman who helped them select the tile for the restaurant gave testimony that may have been particularly significant; she claimed to have chosen the style and brand of tile (which was identical to Fuddruckers') without input from the Koppes.

which have no equivalent at Fuddruckers. Doc's' expert testified that the overall look of the restaurant was different from a Fuddruckers and that there is "more going on at eye level" in Doc's.[5]

There was evidence at trial that after Fuddruckers opened, consumers were confused by the similarity between the restaurants. For example, a Fuddruckers employee testified that Fuddruckers personnel received more than one hundred questions a week about whether Doc's and Fuddruckers had common owners. Doc's' witnesses claimed to have heard a few similar questions or comments, although they believed that more people thought Doc's was like a different restaurant altogether, Flakey Jake's.

About six months after Fuddruckers opened in Phoenix, Fuddruckers brought this suit alleging infringement of its trade dress and seeking damages and injunctive relief. The jury rendered a verdict for Doc's, finding specifically that there was no likelihood of confusion between the two establishments and that Fuddruckers' trade dress had not acquired secondary meaning in the Phoenix area at the time Doc's opened. The district court awarded attorney's fees to Doc's, on the theory that Fuddruckers' suit was merely an anti-competitive ploy. 623 F.Supp. 21. Fuddruckers timely appeals.

The parties make a variety of claims on appeal relating to the sufficiency of the evidence to support the verdict, the adequacy of the jury instructions, and specific evidentiary rulings. As will become apparent, the case turns on the adequacy and correctness of the instructions that the court gave to the jury to define the elements of Fuddruckers' trade dress infringement action. We therefore must examine those elements in some detail.

## DISCUSSION

■ Section 43(a) of the Lanham Act provides a remedy for a broad range of deceptive marking, packaging and market-ing of goods or services in commerce. *Inwood Laboratories v. Ives Laboratories*, 456 U.S. 844, 858, 102 S.Ct. 2182, 2190, 72 L.Ed.2d 606 (1982). A plaintiff seeking to recover for trade dress infringement under section 43(a) must show that its trade dress is protectable and that defendant's use of the same or similar trade dress is likely to confuse consumers. *See First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378 (9th Cir.1987); *Le Sportsac, Inc. v. K. Mart Corp.*, 754 F.2d 71 (2d Cir.1985).

■ Prior trade dress infringement cases in this circuit have involved the copying of products' packages and displays. *See e.g., First Brands Corp.*, 809 F.2d 1378 (antifreeze bottles); *Fabrica, Inc. v. El Dorado Corp.*, 697 F.2d 890 (9th Cir.1983) (carpet display blocks). The test we have articulated for trade dress infringement "is whether there is a likelihood of confusion resulting from the total effect of the defendant's package on the eye and mind of an ordinary purchaser." *Id.* at 894. This case expands the boundaries of trade dress infringement, seeking protection for a combination of elements employed in the marketing of restaurant services. Fuddruckers' suit seeks protection for more than the visual elements of a package or restaurant exterior. Fuddruckers claims that it is entitled to protection of the total visual image of its restaurant services under the rubric of trade dress protection. Other courts have adopted expansive definitions of trade dress, *see, e.g., M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 448 n. 25 (4th Cir. 1986); *Prufrock Ltd. v. Lasater*, 781 F.2d 129, 132 (8th Cir.1986); *CPG Products Corp. v. Pegasus Luggage, Inc.*, 776 F.2d 1007, 1011 (Fed.Cir.1985); *LeSportsac*, 754 F.2d at 75; *see also* 1 J. McCarthy, *Trademarks and Unfair Competition* § 8:1 at 282–83 (2d ed. 1984). We agree with Fuddruckers that a restaurant's decor, menu, layout and style of service may acquire the source-distinguishing aspects of protectable trade dress such that their imitation is likely to cause consumer confusion. In-

---

**5.** In addition, Doc's has a wider menu selection than does Fuddruckers and offers premium beers.

deed, we implicitly recognized that such aspects of a restaurant's services might be entitled to protection under section 43(a) in *Shakeys, Inc. v. Covalt,* 704 F.2d 426, 430–33 (9th Cir.1983).[6]

We also conclude that the elements of a claim for this variety of trade dress infringement should be the same elements we have required for protection in our prior cases. Other courts that have analyzed trade dress infringement claims involving claimed similarities between restaurant decor and image have used the analysis developed in more typical trade dress cases. *See, e.g., Prufrock, Ltd.,* 781 F.2d at 132. Under this analysis, trade dress may be protected if it is nonfunctional and has acquired secondary meaning and if its imitation creates a likelihood of consumer confusion. *Id.; Freddie Fuddruckers, Inc. v. Ridgeline, Inc.,* 589 F.Supp. 72, 77 (N.D. Tex.1984), *aff'd,* 783 F.2d 1062 (1986). We have applied this trade dress analysis in cases involving imitation of packaging, and overall product configuration, *see, e.g., First Brands Corp.,* 809 F.2d at 1381; *Vuitton et Fils S.A. v. J. Young Enterprises,* 644 F.2d 769, 772 (9th Cir.1981), and we agree with the other courts that have confronted the issue that it is the appropriate analysis to apply to a case such as this one. We must, thus, examine the trial court's instructions on the issues of functionality, secondary meaning, and likelihood of confusion.

## I. PROTECTABILITY

### A. Functionality

■ A product feature is functional if it is essential to the product's use or if it affects the cost or quality of the article. *First Brands Corp.,* 809 F.2d at 1381. *See Inwood Laboratories,* 456 U.S. at 850 n.

10, 102 S.Ct. at 2187 n. 10; *LeSportsac,* 754 F.2d at 76; *Warner Bros., Inc. v. Gay Toys, Inc.,* 724 F.2d 327, 331 (2d Cir.1983); *see also Sicilia Di Ri Biebow & Co. v. Cox,* 732 F.2d 417, 429 (5th Cir.1984) (ultimate inquiry in functionality analysis is whether protecting a feature will hinder competition).

The trial court did not instruct the jury on functionality. Both Fuddruckers and Doc's argue that the trial court's omission of an instruction on functionality was error. Doc's asserts that the absence of such an instruction effectively directed a verdict that Fuddruckers' trade dress was nonfunctional. Fuddruckers claims that there was so much discussion of functionality at trial that the jury might have assumed that its trade dress was functional.

■ Fuddruckers does not dispute that its trade dress includes functional elements. That, however, does not end the inquiry. We examine trade dress as a whole to determine its functionality, *First Brands Corp.,* 809 F.2d at 1381; functional elements that are separately unprotectable can be protected together as part of a trade dress. *LeSportsac,* 754 F.2d at 76. In other words, our inquiry is not addressed to whether individual elements of the trade dress fall within the definition of functional, but to whether the whole collection of elements taken together are functional.[7] A restaurant claiming protection for its trade dress "claims as its mark the particular combination and arrangement of design elements" that distinguish it from others using the same concept. *Id.* at 76. A restaurateur cannot prevent others from using any particular color or feature, but can protect a combination of visual elements "that, taken together, ... may create a distinctive visual impression."

6. In *Shakeys, Inc. v. Covalt,* we analyzed a restaurant chain's allegations of infringement of its unregistered service marks under § 43(a). The claimed service marks included restaurant decor, menu content, and "style of preparation," *see* 704 F.2d at 430–31.

7. Viewing the elements as a whole does not result in monopoly protection for necessary elements. If Fuddruckers were to get protection for its trade dress, which includes such items as

directors chairs, white tile, and an open bakery, it could not preclude other restaurants from using those items. It can only prevent competitors from using the items in a way that, viewed as a whole, is likely to confuse consumers. There are many ways to use directors chairs, white tile, open bakeries, and the many other items that make up Fuddruckers' trade dress that would not cause confusion.

*Falcon Rice Mill v. Community Rice Mill,* 725 F.2d 336, 346 (5th Cir.1984) (quoting *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695, 703 (5th Cir.1981), *cert. denied,* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982)). Functionality is a question of fact, *see Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d 1001, 1028–29 (9th Cir. 1983), *cert. denied,* 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986); *Vuitton,* 664 F.2d at 775. We agree with both parties that the absence of an appropriate instruction may have confused the jury. The trial court erred in failing to give a jury instruction on this issue.

## B. *Secondary Meaning*

■ It is not sufficient that Fuddruckers' trade dress be nonfunctional. In order to qualify for protection under Section 43(a) it must also have acquired secondary meaning. The trade dress of a product or service attains secondary meaning when the purchasing public associates the dress with a particular source. *First Brands Corp.,* 809 F.2d at 1383. The court instructed the jury that for its trade dress to be protectable, Fuddruckers had to prove that it had secondary meaning in the Phoenix area at the time Doc's opened. The jury found that it did not.

Fuddruckers claims that it did not have to prove secondary meaning because its trade dress is inherently distinctive and because Doc's intentionally jumped into its zone of expansion. It also claims that the secondary meaning instruction did not allow the jury to give enough weight to intentional copying.[8]

### 1. *Inherent Distinctiveness*

Fuddruckers' argument that a showing of secondary meaning should be unnecessary in connection with an inherently distinctive trade dress has some intuitive appeal. Secondary meaning is, after all, probative of whether claimed trade dress is distinctive, in the trade mark sense of sig-

nifying the source of a product or service to an appreciable portion of the purchasing public. *See Levi-Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1359 (9th Cir. 1985) (en banc). If, as Fuddruckers argues, its claimed trade dress is *inherently distinctive,* the further requirement of a showing of secondary meaning should be superfluous. Fuddruckers cites cases from other courts that have held that an inherently distinctive trade dress may be protected without proof of secondary meaning. *See Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.,* 781 F.2d 604 (7th Cir.1986); *Chevron Chemical Co. v. Voluntary Purchasing, Inc.,* 659 F.2d 695 (5th Cir.1981), *cert. denied,* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982). Furnishing apparent support for Fuddruckers position is the fact that inherently distinctive service marks may be registered without evidence of secondary meaning. *See* 15 U.S.C. §§ 1052, 1053.

Fuddruckers has not registered its "inherently distinctive" trade dress as a service mark, as the statute may permit. It nonetheless seeks to avail itself of the benefits, including nationwide priority, *see* 15 U.S.C. § 1115, that registration would have secured to it.

■ Fuddruckers, moreover, has not offered this court a definition of what "inherently distinctive" in the trademark sense might mean in the absence of secondary meaning. If purchasers do not, in fact, associate Fuddruckers's trade dress with a source of restaurant services, then it is difficult to see how that trade dress distinguishes Fuddruckers' service from the services of others. *See Levi-Strauss & Co.,* 778 F.2d at 1359. We need not, in any event, decide whether it is ever appropriate to protect an inherently distinctive trade dress without proof of secondary meaning. It is clear to us that such an approach is not called for here. We have reviewed the record carefully, and conclude that the evidence Fuddruckers presented would not have supported a finding that its trade

---

8. On the other hand, Doc's claims that the court should have directed a verdict that the trade

dress had not acquired secondary meaning.

dress is inherently distinctive. Fuddruckers claims trade dress protection for the impression created by a collection of common or functional elements of restaurant decor. Such an overall impression may receive protection, but it is simply not the sort of arbitrary or uncommon trade dress that might qualify as inherently distinctive. *See Blau Plumbing*, 781 F.2d at 609–11.

### 2. Territorial Expansion

Fuddruckers' second concern with the secondary meaning instructions is that the court required that it show secondary meaning in Phoenix, prior to Doc's opening its restaurant. We agree with Fuddruckers that the instruction was unduly narrow. The source of the geographical and time limitations the court included in its instructions is a line of cases defining rights in unregistered trademarks between geographically remote users who adopted similar marks in good faith and without knowledge of each other's use. *See United Drug Co. v. Rectanus Co.*, 248 U.S. 90, 98, 39 S.Ct. 48, 51, 63 L.Ed. 141 (1918); *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 416, 36 S.Ct. 357, 361, 60 L.Ed. 713 (1916); *Weiner King, Inc. v. Weiner King Corp.*, 615 F.2d 512, 522 (C.C.P.A.1980); 2 J. McCarthy, *supra*, § 26:1 at 286–87. The rule that developed in those cases permits junior users to continue to use a mark adopted in good faith in the geographical area of the junior user's actual use. The rule has only limited applicability to services such as hotels or restaurants, because their customers "are ambulatory and on the move back and forth across the nation. 2 J. McCarthy, *supra*, § 26:6 at 296; *see Lincoln Restaurant Corp. v. Wolfies Rest. Inc.*, 291 F.2d 302 (2d Cir.), *cert. denied*, 368 U.S. 889, 82 S.Ct. 143, 7 L.Ed.2d 88 (1961); *cf. Stork Restaurant, Inc. v. Sahati*, 166 F.2d 348 (9th Cir.1948) (applying California law).

■ Doc's concedes that it was aware of Fuddruckers's operations, and familiar with its trade dress, so the good faith junior user line of cases does not apply here. Under these circumstances, we see no justification for requiring Fuddruckers to prove that secondary meaning developed in the Phoenix area before Doc's opened its restaurant. Fuddruckers is a national restaurant chain, and restaurant customers travel. Fuddruckers should be permitted to show that its trade dress had acquired secondary meaning among some substantial portion of consumers nationally. *See Holiday Inns of America, Inc. v. Mullen's Holiday Inn, Inc.*, 292 F.Supp. 755 (E.D. Cal.1968).

### 3. Copying and Secondary Meaning

The court instructed the jury that it could "consider" a finding that Doc's had copied Fuddruckers' trade dress on the issue whether the dress had acquired secondary meaning.[9] Fuddruckers claims that the instruction did not go far enough. We disagree.

■ Our cases recognize that evidence of deliberate copying is relevant to a determination of secondary meaning. *E.g., Transgo*, 768 F.2d at 1015–16; *cf. Audio Fidelity, Inc. v. High Fidelity Recordings*, 283 F.2d 551, 557–58 (9th Cir.1960) (applying California law). Indeed, in appropriate circumstances, deliberate copying may suffice to support an inference of secondary meaning. *See Transgo*, 768 F.2d at 1016 (dictum). The trial court's instruction permitted, but did not require, the jury to infer the existence of secondary meaning from a finding of intentional copying. Fuddruckers would have us go further, and hold that evidence of deliberate copying shifts the burden of proof on the issue of secondary meaning. We decline to so hold. Competitors may intentionally copy product features for a variety of reasons. They may, for example, choose to copy wholly func-

---

**9.** The court instructed:

If you find that the defendants copied Fuddruckers' trade dress with the intention of taking advantage of Fuddruckers' reputation and good will by confusing customers into believing that Doc's was owned or franchised by Fuddruckers, you may consider that finding on the issue of whether Fuddruckers' trade dress had a secondary meaning in the Phoenix metropolitan area at the time Doc's opened.

tional features that they perceive as lacking any secondary meaning because of those features' intrinsic economic benefits. *See Fabrica,* 697 F.2d at 894; *Sicilia,* 732 F.2d at 428.

## II. Likelihood of Confusion

### A. Jury Instruction as to Source

Even if Fuddruckers trade dress is protectable, in order to constitute an infringement, Doc's use may be likely to confuse consumers. The trial court asked the jury to determine whether there was "a likelihood that consumers would believe that Doc's was owned and franchised by Fuddruckers." Fuddruckers claims this instruction was too narrow, and argues that the likelihood of *any* mistaken consumer belief that the two operations had the same source constitutes infringement. We agree.

■■■ Likelihood of confusion " 'exists when customers viewing the mark would probably assume that the product or service it represents *is associated with the source* of a different product or service identified by a similar mark.' " *Lindy Pen Co. v. Bic Pen Corp.,* 725 F.2d 1240, 1243 (9th Cir.1984) (*Lindy Pen I*) (quoting *Alpha Industries,* 616 F.2d at 443) (emphasis added), *cert. denied,* 469 U.S. 1188, 105 S.Ct. 955, 83 L.Ed.2d 962 (1985); *see also id.* at 1246 (test for likelihood of confusion embraces "confusion between the goods or sponsorship of the allegedly infringing goods"). Nothing in the *Lindy Pen I* definition suggests that actionable likelihood of confusion should be limited to consumer belief that the infringer is being operated by the original user. The potential for harm is equally great if the consumers believe that the infringer runs the original user. For example, if consumers believe that Doc's runs Fuddruckers, and they are disappointed with the quality of Doc's food or service, they may be deterred from patronizing Fuddruckers. Doc's points to no cases that hold that one type of confusion is more actionable than the other.[10] The court's instruction was error.

■■ Doc's asserts that the error is harmless. We disagree. There was considerable evidence of actual confusion as to source. Fuddruckers' primary witness on the issue testified that perhaps one hundred times a week, consumers asked if Fuddruckers was owned by the same people who own Doc's. Another witness testified that people asked if Fuddruckers is associated with Doc's and if they are "the same restaurant or not." Doc's witnesses testified that consumers occasionally asked if Doc's was affiliated with Fuddruckers. There was little or no evidence presented, however, that consumers asked specifically whether Doc's was owned or franchised by Fuddruckers. The jury might well have discounted the evidence of actual confusion because it did not precisely fit what the court instructed them to look for.

■■ The factual elements that make up likelihood of confusion include evidence of actual confusion, the defendant's intent in adopting the mark, similarity of marks, similarity of goods and marketing channels, and the strength of the mark. *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 782 F.2d 1508, 1509. (9th Cir.1986); *Lindy Pen I,* 725 F.2d at 1243; *Golden Door, Inc. v. Odisho,* 646 F.2d 347, 349–50 (9th Cir.1980). The factors are not weighted evenly. *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1527 (4th Cir.1984); *Golden Door,* 646 F.2d at 351.

■■ Evidence of actual confusion is persuasive proof that future confusion is likely. *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 352 (9th Cir.1979); *see Falcon Rice Mill,* 725 F.2d at 347–48; *Chevron,* 659 F.2d at 704; *Golden Door,* 646 F.2d at 351. A showing that the defendant intended to adopt the plaintiff's trade dress is

**10.** Doc's reliance on language in *Levi-Strauss,* 778 F.2d at 1359, is misplaced. In that case, we did say that "... Strauss [the original user] must establish that consumers are likely to believe that Blue Bell [the alleged infringer] shirts emanate from Strauss." *Id.* However, in context, the statement merely refers to Strauss's need to make a separate showing of confusion with regard to the shirt market. *See id.* The possibility that consumers might believe Strauss products emanated from Blue Bell was not at issue in that case.

also "entitled to great weight because a defendant is presumed able to accomplish this purpose." [11] *Golden Door,* 646 F.2d at 351 (citing *AMF,* 599 F.2d at 354); *see M. Kramer Mfg. Co.,* 783 F.2d at 448 n. 24 (courts almost unanimously presume a likelihood of confusion based on a showing of intentional copying) (citing 2 McCarthy at §§ 23:34–35)); *see also Sno-Wizard Manufacturing Co. v. Eisemann Products Co.,* 791 F.2d 423, 428 (5th Cir.1986) (intent alone may be enough to support finding of likelihood of confusion) (quoting *Chevron,* 659 F.2d at 704); *but see Lois Sportswear, USA, Inc. v. Levi-Strauss & Co.,* 799 F.2d at 867, 875 (2d Cir.1986) ("intent is largely irrelevant in determining if consumers likely will be confused as to source"). Fuddruckers presented credible evidence of both actual confusion and intent to copy.

In addition, the products and marketing channels of the parties were nearly identical, so a finding by the jury that the marks were very similar would have been sufficient to support a verdict for Fuddruckers on this issue. *See Lindy Pen Co. v. Bic Pen Corp.,* 796 F.2d 254, 256–57 (9th Cir. 1986) (*Lindy Pen II*); *Park 'N Fly,* 782 F.2d at 1509; *Golden Door,* 646 F.2d at 351; *New West Corp. v. NYM Co.,* 595 F.2d 1194, 1202 (9th Cir.1979). At least judging from the testimony and the photographs in

evidence, the trade dresses were very similar. *See* Appendix I.

Incorrect instructions given in a civil trial require reversal unless the jury's verdict is more probably than not untainted by the error. *Jenkins v. Whittaker Corp.,* 785 F.2d 720, 730 (9th Cir.) (citing *Haddad v. Lockheed California Corp.,* 720 F.2d 1454, 1459 (9th Cir.1983)), *cert. denied,* —— U.S. ——, 107 S.Ct. 324, 93 L.Ed.2d 296 (1986). Under the circumstances, we cannot say that the verdict was more probably than not untainted by the error and must reverse the verdict on likelihood of confusion. *See Jenkins,* 785 F.2d at 730.

*B. Sufficiency of the Evidence*

■ Both parties contend that there was insufficient evidence to support the other side's position to justify sending the likelihood of confusion issue to the jury.[12] We disagree. As indicated, the evidence was more than sufficient to support a verdict in Fuddruckers' favor. Doc's was not entitled to a directed verdict.[13]

Despite the strength of Fuddruckers case on this issue, the evidence of intent to copy was not conclusive, and the jury was entitled to disbelieve the evidence of actual confusion because it was presented primarily through Fuddruckers' employees. *See Sno-Wizard,* 791 F.2d at 429 (approving

**11.** We have said that evidence of intent to exploit the plaintiff's goodwill shifts the burden to the defendant to prove no likelihood of confusion. *HMH Publishing Co. v. Brincat,* 504 F.2d at 713, 720 (9th Cir.1974). However, this formulation has not been repeated in later cases. It may be that the shifting burden only applies when the evidence demonstrates that the defendant intended to exploit, rather than merely to copy. *See Toho Co. v. Sears, Roebuck & Co.,* 645 F.2d at 788, 791 n. 2 (9th Cir.1974).

**12.** The parties claimed that the standard of review for the jury's verdict on the likelihood of confusion issue was "clearly erroneous." Although likelihood of confusion is predominantly a factual question, *Levi-Strauss,* 778 F.2d at 1355, the parties' assertion ignores the distinction between reviewing jury verdicts and reviewing district court findings. *See Sarkisian v. Winn-Proof Corp.,* 688 F.2d 647, 651 (9th Cir. 1982) (en banc) (per curiam), *cert. denied,* 460 U.S. 1052, 103 S.Ct. 1499, 75 L.Ed.2d 930 (1983).

**13.** Doc's relies on *T.G.I. Friday's, Inc. v. Int'l Restaurant Group, Inc.,* 405 F.Supp. 698 (M.D.

La.1975), *aff'd,* 569 F.2d 895 (5th Cir.1978) to claim that the prominent use of its name (which is very different from Fuddruckers) throughout its trade dress precludes a finding of likelihood of confusion. Its reliance is misplaced. The *Friday's* court addressed two separate claims: service mark infringement and trade dress infringement. On the first issue, the court found, despite similarities in the dress, that there was no similarity *between the marks.* 405 F.Supp. at 706–07. It found no trade dress infringement because the plaintiff's dress had not acquired *secondary meaning. Id.* at 708–09. Although the court mentioned the dissimilarity in names as a factor, *id.* at 709, it nowhere suggested that dissimilar names necessarily prevent confusion between trade dresses.

Use of differing names or distinctive logos in connection with similar marks can reduce the likelihood of confusion but doesn't always do so. *See Lindy Pen I,* 725 F.2d at 1245 n. 4; *AMF,* 599 F.2d at 351. The issue is properly part of the factual determination left to the jury.

district court's rejection of evidence of actual confusion). Moreover, the jury was in a better position than a reviewing court to determine the similarity of the two trade dresses; it viewed many photographs and visited the restaurants. *See Lindy Pen I*, 725 F.2d at 1245 (similarity should be considered in light of way marks are viewed in marketplace); *Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 444 (9th Cir.1980) (same). Doc's presented evidence of a number of differences between the two establishments, and given the level of detail involved in Fuddruckers' trade dress, slight variations in color or design might be sufficient to eliminate confusion. *See Falcon Rice*, 725 F.2d at 346. In short, Fuddruckers' evidence, although strong, does not compel a finding of likelihood of confusion and a reasonable jury, even with proper instructions, might have reached the same conclusion the original jury reached.

### III. Unclean Hands

Doc's claims that Fuddruckers falsely describes its hamburger meat as "ground steak," and that this "deception" constitutes "unclean hands" and should bar any relief under the Lanham Act. The trial court refused to present the unclean hands defense to the jury. Doc's claims that it is entitled to a directed verdict on the issue of unclean hands, or, in the alternative, that the issue should have gone to the jury. We disagree.

■ Unclean hands is a defense to a Lanham Act infringement suit. *CIBA–GEIGY Corp. v. Bolar Pharmaceutical*, 747 F.2d 844, 855 (3d Cir.1984), *cert. denied*, 417 U.S. 1137, 105 S.Ct. 2678, 86 L.Ed.2d 696 (1985); *see generally Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1256–58 (9th Cir.1982). To prevail, the defendant must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims. *CIBA–GEIGY*, 747 F.2d at 855. "[E]quity requires that those seeking its protection shall have acted fairly and without fraud or deceit *as to the controversy in issue.*" *Ellenburg v. Brockway, Inc.*,

763 F.2d 1091, 1097 (9th Cir.1985) (emphasis added).

Doc's relies on two cases in which the trademark for which protection was sought was misleading. *Worden & Co. v. California Fig Syrup Co.*, 187 U.S. 516, 533–34, 23 S.Ct. 161, 166, 47 L.Ed. 282 (1903) (laxative name "Syrup of Figs" unprotectable where product contains no figs or fig juice); *Haagen-Dazs, Inc. v. Frusen Gladje, Ltd.*, 493 F.Supp. 73, 76 (S.D.N.Y.1980) (Scandinavian marketing theme for ice cream unprotectable where plaintiff deceptively implied product was of Scandinavian origin). In *Worden*, the Supreme Court said,

> if the plaintiff makes any *material* false statement in connection with the property which he seeks to protect, he loses his right to claim the assistance of a court of equity; that where any symbol or label claimed as a trade-mark is so constructed or worded as to make or contain a distinct assertion which is false ... the right to exclusive use of it cannot be maintained.

187 U.S. at 528, 23 S.Ct. at 164 (emphasis added). *Worden* recently has been interpreted to mean that "a court should not protect the exclusive right to use a name or mark which is misleading to the public." *Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1355 (11th Cir.1983).

■ Even assuming that Doc's factual assertions are correct, the misstatement is not material and the trade dress is not misleading. The appeal of Fuddruckers' trade dress is not enhanced significantly by the claim that its burgers are made from ground steak. "Ground steak" simply is not a major part of the trade dress. Moreover, unlike the trademarks at issue in the cases relied upon by Doc's, Fuddruckers' trade dress, viewed as a whole, is not misleading. The trial court properly kept this issue from the jury. *See Shatel*, 697 F.2d at 1355 (courts reluctant to find unclean hands where misuse of registration symbol immaterial to the litigation).

### IV. Other Claims

Because of the result we reach, we need not address the other issues raised by Fud-

druckers on appeal, including challenges to the exclusion of evidence and to the trial court's refusal to allow conspiracy instructions. We reverse the district court's grant of attorney's fees because Doc's no longer is a prevailing party. *See* 15 U.S.C. § 1117 (1982).

## CONCLUSION

Trade dress infringement under the Lanham Act is a complicated area of the law made more difficult by a heavy overlay of case law that seems at least facially inconsistent. Moreover, the trial court's task in this case was made more difficult because most of our rulings on the subject have been made in the context of review of bench trials and little guidance was available to the parties or the court in respect to jury instructions. This is a difficult and close case, and a jury on retrial may again find that Fuddruckers' trade dress is unprotectable or that there was no likelihood of confusion. However, Fuddruckers is entitled to a verdict that is based on instructions that correctly present the law to the jury.

REVERSED and REMANDED.

APPENDIX I

**Ex. 23A**
**The Butcher Shops**
**Fuddruckers**

850

Ex. 23B
Doc's

**Ex. 23H**
**The Cheese, Jalapeño Cheese and Sauerkraut Crock Pots**
**Fuddruckers**

852

**Ex. 23I**
**Doc's**

**Ex. 23T**
**Fuddruckers**

854

Ex. 23U
The Bakeries
Doc's

**Ex. 23S**
**The Garnishment Islands**
**Fuddruckers**