This Opinion is a
Precedent of the TTAB

Mailed: March 29, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*In re Hikari Sales USA, Inc.*

————

Serial No. 86439012

————

Patchen M. Haggerty and Stefan B. Blum of Perkins Coie,
    for Hikari Sales USA, Inc.

Lyndsey Kuykendall, Trademark Examining Attorney, Law Office 124,
    Lydia Belzer, Managing Attorney.

————

Before Bergsman, Hightower and Goodman,
    Administrative Trademark Judges.

Opinion by Goodman, Administrative Trademark Judge:

On October 29, 2014, Hikari Sales USA, Inc. ("Applicant") filed an application to register the mark ALGAE WAFERS (in standard characters) for "Fish food" in International Class 31, on the Principal Register, claiming acquired distinctiveness under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f), based on five years of substantially exclusive and continuous use in commerce.[1]

---

[1] Application Serial No. 86439012 was filed on October 29, 2014, based upon Applicant's claim of first use anywhere and use in commerce since at least as early as October 31, 1991.

## I. Procedural Background

The Trademark Examining Attorney initially refused registration of Applicant's applied-for mark on the ground that the mark is merely descriptive of Applicant's goods under Trademark Act Section 2(e)(1), 15 U.S.C. § 1052(e)(1).[2] In response, Applicant submitted additional evidence to support its claim of acquired distinctiveness. Thereafter, in a second nonfinal Office Action registration was refused because the proposed mark is generic as applied to the goods. The Examining Attorney also refused registration on the basis that if the mark is not generic, Applicant's claim of distinctiveness based on five years' use and additional evidence of distinctiveness is insufficient due to the highly descriptive nature of the mark.

When the refusal was made final, Applicant appealed and requested reconsideration. After the Examining Attorney denied the request for reconsideration, the appeal resumed. We affirm the refusal to register on both grounds.

For clarity, we note that by issuing a Section 2(e)(1) descriptiveness refusal with an advisory that the designation was likely generic in the first Office Action when the Applicant filed the application for registration on the Principal Register based on a claim of distinctiveness under Section 2(f), the Examining Attorney did not follow the

---

Page references herein to the application record refer to the online database of the USPTO's Trademark Status & Document Retrieval (TSDR) database. References to the briefs on appeal refer to the Board's TTABVUE docket system.

[2] The Examining Attorney's initial Office Action did not address Applicant's Section 2(f) claim but stated that amendment to Section 2(f) appeared unavailable. February 21, 2015 Office Action p. 1.

examination procedure set forth in Section 1209.02(b) of the Trademark Manual of Examining Procedure ("TMEP") (October 2018).

"Where, as here, an applicant seeks a registration based on acquired distinctiveness under Section 2(f), the statute accepts a lack of [inherent] distinctiveness as an established fact." *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1571, 6 USPQ2d 1001, 1005 (Fed. Cir. 1988). For an applicant seeking "registration on the basis of Section 2(f), the mark's descriptiveness is a nonissue; an applicant's reliance on Section 2(f) during prosecution presumes that the mark is descriptive." *Cold War Museum, Inc. v. Cold War Air Museum, Inc.*, 586 F.3d 1352, 92 USPQ2d 1626, 1629 (Fed. Cir. 2009). The Examining Attorney may rely on this concession alone. TMEP § 1212.02(b).

As a result, the Examining Attorney should not have issued a descriptiveness refusal with an advisory that the designation was likely generic in the first Office Action. Rather, the Examining Attorney, in the first Office Action, should have issued a refusal that the designation is a generic name for the Applicant's goods under Trademark Act §§ 1, 2 and 45, 15 U.S.C. §§ 1051, 1052, 1127,[3] and alternatively refused registration on the basis that even if the mark is not found generic, it is

---

[3] Although Applicant filed for registration on the Principal Register and during examination did not seek amendment to the Supplemental Register, the Examining Attorney issued her genericness refusal under Trademark Act Sections 23(c) and 45, 15 U.S.C. §§ 1091(c) and 1127, which is the statutory basis for refusal of a generic term seeking registration on the Supplemental Register. The proper statutory basis for a genericness refusal for an application of a generic term for goods seeking registration on the Principal Register is Trademark Act Sections 1, 2, and 45, 15 U.S.C. §§ 1051, 1052, and 1127. TMEP § 1209.01(c). The legal analysis on the question of genericness is the same under Section 23 and Sections 1, 2 and 45; thus, citation to the incorrect statutory basis in this case does not require remand.

merely descriptive under Section 2(e)(1) and Applicant's claim of distinctiveness based on five years of substantially exclusive use was insufficient given the highly descriptive nature of the mark. TMEP § 1209.02(b).

## II. Genericness

"A generic mark, being the 'ultimate in descriptiveness,' cannot acquire distinctiveness, and is not entitled to registration on either the Principal or Supplemental Register under any circumstances." *In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 116 USPQ2d 1262, 1264 (Fed. Cir. 2015) (quoting *H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.*, 782 F.2d 987, 228 USPQ 528, 530 (Fed. Cir. 1986)). A designation is generic if it refers to the class or category of goods or services on or in connection with which it is used. *In re Dial-A-Mattress Operating Corp.*, 240 F.3d 1341, 57 USPQ2d 1807 (Fed. Cir. 2001) (citing *Marvin Ginn*, 228 USPQ 528). "[A] term [also] is generic if the relevant public understands the term to refer to part of the claimed genus of goods or services, even if the public does not understand the term to refer to the broad genus as a whole." *In re Cordua Rests., Inc.*, 823 F.3d 594, 118 USPQ2d 1632, 1638 (Fed. Cir. 2016) ("the term 'pizzeria' would be generic for restaurant services, even though the public understands the term to refer to a particular sub-group or type of restaurant rather than to all restaurants"). "The test is not only whether the relevant public would itself use the term to describe the genus, but also whether the relevant public would understand the term to be generic." *In re 1800Mattress.com IP LLC*, 586 F.3d 1359, 92 USPQ2d 1682, 1685 (Fed. Cir. 2009).

The test for determining whether a proposed mark is generic is its primary significance to the relevant public. *Magic Wand Inc. v. RDB Inc.*, 940 F.2d 638, 19 USPQ2d 1551, 1553-54 (Fed. Cir. 1991); *Marvin Ginn*, 228 USPQ at 530. Making this determination "involves a two-step inquiry: First, what is the genus of goods or services at issue? Second, is the term sought to be registered ... understood by the relevant public primarily to refer to that genus of goods or services?" *Marvin Ginn*, 228 USPQ at 530.

Addressing the first part of the genericness inquiry, we find in this case that the genus of goods is commensurate with Applicant's identification of goods in the application, i.e., "fish food." *See Magic Wand*, 19 USPQ2d at 1552 ("[A] proper genericness inquiry focuses on the description of [goods or] services set forth in the [application or] certificate of registration."). The Examining Attorney and the Applicant are in agreement that "fish food" is the genus. 7 TTABVUE 13; 9 TTABVUE 6. This genus includes the sub-category of fish food that comes in wafer form and contains algae.

We next proceed to the second part of the *Marvin Ginn* inquiry: whether the term "Algae Wafers" is understood by the relevant public primarily to refer to fish food, including the type of fish food offered by Applicant that comes in wafer form and contains algae. *Marvin Ginn*, 228 USPQ at 530. In this case, where the goods are "fish food," the relevant public would be those individuals who use or purchase fish food, i.e., plant or animal material for consumption by fish kept in aquariums or ponds. We consider "[e]vidence of the public's understanding of the term [which] may

be obtained from any competent source, such as purchaser testimony, consumer surveys, listings in dictionaries, trade journals, newspapers, and other publications." *In re Merrill Lynch, Pierce, Fenner & Smith Inc.*, 828 F.2d 1567, 4 USPQ2d 1141, 1143 (Fed. Cir. 1987). Competitor use may be evidence of genericness. *See BellSouth Corp. v. DataNational Corp.*, 60 F.3d 1565, 35 USPQ2d 1554, 1558 (Fed. Cir. 1995) ("The cases have recognized that competitor use is evidence of genericness.") (citing *Remington Prods., Inc. v. N. Am. Philips Corp.*, 892 F.2d 1576, 13 USPQ2d 1444, 1446 (Fed. Cir. 1990)); *Continental Airlines, Inc. v. United Air Lines, Inc.*, 53 USPQ2d 1385, 1395 (TTAB 1999) (use of term "e-ticket" by media and competitors indicates term is generic for electronic tickets); *Philip Morris Inc. v. Brown & Williamson Tobacco Corp.*, 230 USPQ 172, 176 (1986) (evidence that competitors have used a particular word as the name of their goods is persuasive evidence of genericness).

The following evidence bearing on the public's understanding of "Algae Wafers" is of record.

a)  Dictionary definitions of Algae and Wafer

> **Algae** (plural of alga): "a plant or plantlike organism of any of several phyla, divisions, or classes of chiefly aquatic usually chlorophyll containing nonvascular organisms of polyphyletic origin that usually include the green, yellow-green, brown and red algae in the eukaryotes and especially formerly the cyanobacteria in the prokaryotes." February 21, 2015 Office Action pp. 3-4, Merriam-webster.com.

> **Wafer**,: "a small round thin object"; also "a thin disk or ring resembling a wafer and variously used." February 21, 2015 Office Action pp. 6-7, Merriam-webster.com.[4]

---

[4] Additional definitions of "wafer" provided at Merriam-webster.com:

b) Applicant's use

Applicant's Specimen.



As is evident from the packaging, Applicant's goods are pictured in wafer or disk

form, and the packaging includes the following statements: "Ideal for Algae Eaters"

---

: a thin crisp cracker
: a round, thin piece of bread eaten during the Christian Communion ceremony
: a small, round, thin object
1 a: a thin crisp cake, candy or cracker
    b: a round thin piece of unleavened bread used in the celebration of the Eucharist
2 an adhesive disk of dried paste with added coloring matter used as a seal
3 b: a thin slice of semiconductor (as silicon) used as a base for an electronic component or circuit.
February 21, 2015 Office Action pp. 6-7, MERRIAM WEBSTER DICTIONARY, Merriam-webster.com.

"Natural Green Color from Multiple Beneficial Algae" "World's 1st Wafer Shaped Algae Diet," and "Vegetable Rich Wafer." Specimen p. 1.

The specimen also states "Contains Pure-Cultured Spirulina,"[5] and Applicant's ingredient label, shown below, indicates that the goods include spirulina as an ingredient. *Id.*; August 23, 2016 Response to Suspension Inquiry p. 13.

**INGREDIENTS**
White Fish Meal, Wheat Flour, Wheat-germ Meal, alpha Starch, Dehydrated Alfalfa Meal, soybean Meal, Fish Oil, Brewer's Dried Yeast, Shrimp Meal, Spirulina, Carotenoid, Sodium Phosphate, Salt, Vitamin A Supplement, vitamin D3 (D Activated Animal Sterol), Vitamin E (d1-d-Tocopherol Acetic Acid) Vitamin B1 (Thiamine Nitrate), Vitamin B2 (Riboflavin), Vitamin K3 (Menadion Dimethylpyrimidinol Disulfite), Ascorbic Acid, Choline Chloride, Magnesium Carbonate, Potassium Phosphate Bihydrate.

Applicant's brochure regarding "Algae Wafers" states, among other things, that the fish food was "developed for the hard to feed Plecostomus, algae eaters and other bottom feeders," whose "natural diet" is "algae and vegetable matter," that "[t]he HIKARI sinking wafer is an easy, convenient way to feed all algae eaters," "[t]hrough advanced manufacturing technology, this algae wafer will not dissolve or cloud the water," and "[w]afers can be broken into smaller pieces if desired."[6] August 23, 2016 Response to Suspension Inquiry pp. 10-11 (exhibit to Declaration of Christopher

---

[5] "Spirulina" is defined as "any of the blue-green algae of the genus *Spirulina,* sometimes added to food for its nutrient value." Dictionary.com based on the RANDOM HOUSE DICTIONARY (2018). The Board may take judicial notice of dictionary definitions, including online dictionaries that exist in printed format. *In re Cordua Rests. LP*, 110 USPQ2d 1227, 1229 n.4 (TTAB 2014), *aff'd*, 823 F.3d 594, 118 USPQ2d 1632 (Fed. Cir. 2016); *Threshold.TV Inc. v. Metronome Enters. Inc.*, 96 USPQ2d 1031, 1038 n.14 (TTAB 2010); *In re Red Bull GmbH*, 78 USPQ2d 1375, 1378 (TTAB 2006).

[6] The brochure was first used in 1995. August 23, 2016 Response to Suspension Inquiry p. 10 (Clevers Declaration).

Clevers, President and Chief Operating Officer of Hikari Sales USA, Inc. ("Clevers Declaration")). On the Walmart.com website, under the heading "About this item," "Algae Wafers" is described as "algae eater fish food" with a "unique disc shape." February 21, 2015 Office Action p. 16 (Walmart.com).

    c) Competitor use

The Examining Attorney included evidence of competitor use. Some examples are provided below.

> Tetra offers "Tetra TetraVeggie Tropical Algae Wafers" described as "algae fish food" and a "large sinking wafer." (tetra-fish.com). February 21, 2015 Office Action p. 10.[7]



> Doctors Foster and Smith offers "Cobalt Aquatics" "Algae Wafers" that "[d]elivers nutrition to bottom-feeding herbivores with sinking algae wafers" the "[q]uick sinking algae wafers contain a quality mix of marine and plant-based ingredients …"[8]
> (Drsfostersmith.com). October 4, 2016 Office Action pp. 5-6.

---

[7] According to Applicant, Spectrum Brands, the owner of Tetra, is no longer using "Algae Wafers" on its products. August 23, 2016 Response to Suspension Inquiry pp. 1, 33 and 36; April 4, 2017 Response to Office Action p. 34.

[8] Applicant offered evidence in its April 4, 2017 Response to Office Action that Cobalt Aquatics changed its product name which is now shown as "Algae Grazers." *See* pp. 1, 42-46.

Petsmart offers API® Algae Eater Premium Algae Wafers For Algae Eating Fish" described as a "sinking wafer … formulated with a rich



blend of algae, including spirulina."
(Petsmart.com). May 5, 2017 Office Action pp. 4-6.

Angels Plus offers "algae wafers and vegetable discs."
(Angelsplus.com). May 5, 2017 Office Action p. 2.

Your Fish Stuff offers "YFS Veggie Wafers." Under the description of the product it states "Feed our YFS Algae Wafers to plecos, catfish, loaches or any omnivorous bottom feeding fish that appreciate veggies in their diet."



(Yourfishstuff.com). May 5, 2017 Office Action p. 30.

Lakeway Tilapia offers specialty food "[m]anufactured by Ziegler … these Spirulina algae wafers are an excellent first food for all tilapia fry."
(Lakewaytilapia.com). October 4, 2016 Office Action p. 19.

American Aquarium Products offers HBH Algae Grazers which is described as a "SUPERIOR Algae wafer with spirulina as the number 1 ingredient …"
(Americanaquariumproducts.com). October 4, 2016 Office Action pp. 11-12.[9]

---

[9] According to the webpage, these products are discontinued, and the remaining stock is being sold off as the company is out of business.

Aquadine® offers "DuraDisk® Sinking **Algae Wafer**" ". . . a high-quality sinking **algae wafer**…"



(Aquadine.com). October 4, 2016 Office Action pp. 2-3.

Live Fish Direct offers "spirulina flake and algae wafers." (Livefishdirect.com). October 4, 2016 Office Action pp. 20-21.

d) Internet website third-party use by retailers or websites providing consumers with information regarding fish food for algae-eating fish:

"A well-balanced Algae Eater diet consists of Algae and sinking algae wafers …"
(Petco.com). October 4, 2016 Office Action p. 24.

"Algae wafers are the best option for bottom feeders. … Here are my top algae wafer choices."
*Top 3 Algae Wafers* (Freshaquarium.about.com). February 21, 2015 Office Action pp. 21-22.

"Sucker fish foods can be supplemented with algae wafers."
*Sucker Fish Food* (Animals.mom.me). May 5, 2017 Office Action p. 26.

e) Use in books

The Examining Attorney provided excerpts from three books accessed through a search of books.google.com:

"Diet: Offer foods high in vegetable content, such as spirulina flakes and pellets, and algae wafers." at 74.
MARK PHILLIP SMITH, LAKE VICTORIA BASIN CICHLIDS EVERYTHING ABOUT HISTORY, SETTING UP AN AQUARIUM, HEALTH CONCERNS AND SPAWNING (2001), May 5, 2017 Office Action p. 22.

Common Plec … It should also be fed algae wafers …"

KEVIN WILSON, TROPICAL FISH SPECIES GUIDE, October 4, 2016 Office Action p. 28.

"Specific types of vegetable foods such as algae wafers are manufactured to meet the needs of these types of fish" at 142.
MADDY HARGROVE & MIC HARGROVE, FRESHWATER AQUARIUMS FOR DUMMIES, October 4, 2016 Office Action p. 10.

f) Use in news stories

"The algae wafers I dropped in at night would be gone in the morning, so I knew he was in there. … Then one night, about a month ago, I walked in on Scrubber and saw him stretched out, full-length sucking on an algae wafer." Ken Hoffman, *Farewell to my old buddy Scrubber,* HOUSTON CHRONICLE, December 7, 2015. May 5, 2017 Office Action pp. 10-11.

"Or he's hoping we'll toss in another algae wafer, his favorite meal." *Spacious Digs Sought for Overgrown Fish*, JOURNAL SENTINEL, February 4, 2010. May 5, 2017 Office Action p. 16.

"A dechlorinator, two bottles of water conditioner, two bags of algae wafers, 20 serpae tetra fish, two aquarium heaters and $10 cash were stolen." *More Fish Stolen in Burglary at Lincoln Pet Store*, KETV, January 2, 2012, (ketv.com). May 5, 2017 Office Action p. 17.

g) Search results from the Google search engine of the term "algae wafers."[10]

"If you plan to keep bottom feeders or algae eaters in your tank you may need to supplement their diet with algae wafers." *Will Algae Wafers*

---

[10] Generally, search engine results are not entitled to much weight if they lack context, *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 82 USPQ2d 1828, 1833 (Fed. Cir. 2007), but the probative value of the evidence will vary depending on, among other things, the circumstances of the case. *In re Fitch IBCA Inc.*, 64 USPQ2d 1058, 1060 (TTAB 2002); *see also, e.g., In re BetaBatt Inc.*, 89 USPQ2d 1152, 1153 n.1 (TTAB 2008) (finding some search hits "relevant because the text is sufficient to show the context in which the term is used," while other search results were not probative because they were so abbreviated the context was unclear). In this case, several of the search "hits" have sufficient context to show generic use of the term "algae wafers."

There are several references to Applicant in the record from the Google Search results but many are from foreign sources or show foreign use, or are abbreviated and lacking context. To the extent any may weigh in Applicant's favor, they are outweighed by the more probative and persuasive evidence above. August 23, 2016 Response to Suspension Inquiry pp. 51-53.

*Make My Tank Water Cloudy* (no date of forum post shown). (ratemyfishtank.com). August 23, 2016 Response to Suspension Inquiry p. 49.

"I've just bought some algae wafers for the first time to feed my pitbull plecs …" *How to feed algae wafers?* February 7, 2011. (Aquariumadvice.com). August 23, 2016 Response to Suspension Inquiry p. 51.

"I was wondering why my Oto and my Pleco don't eat the algae wafers …" *Pleco & Oto Not Eating Algae Wafers? HELP* (no date of forum post shown). (Myaquariumclub.com). August 23, 2016 Response to Suspension Inquiry p. 53.

"One of the best ways to provide this [algae snack] for your fish is algae wafers." *Algae Wafers – The Perfect Snack For Your Goldfish.* (no date of forum post shown). (How- totakecareofgoldfish.com). August 23, 2016 Response to Suspension Inquiry p. 53.

"I have started to drop algae wafers in the tank during feeding time …" *Algae Wafers 33254 - Aquarium Fish*, November 25, 2008. (Fishlore.com). August 23, 2016 Response to Suspension Inquiry p. 53.

"Reason being that I put in algae wafers is I have a pleco to feed." *Oscar Fish Advice Forum: Do O's Eat Algae Wafers?*, April 1, 2010. (Oscarfishlover.com). August 23, 2016 Response to Suspension Inquiry p. 53.

h) Applicant's policing activity

Applicant provided evidence that it filed a lawsuit against third parties Spectrum Brand Holdings, United Pet Group, Cobalt International, and Elive LLC for trademark infringement and false designation of origin and unfair competition based on their use of "algae wafers" and "sinking discs."[11] August 20, 2015 Response to Office Action pp. 3-45.

---

[11] Applicant did not provide any final orders in the civil action but provided the complaint. August 20, 2015 Response to Office Action.

Applicant also provided evidence that two of the competitors named in the civil action, Spectrum, offering Tetra Algae Fish Food Wafers,[12] and Cobalt International, offering Cobalt Aquatics Algae Wafers, and some of the competitors listed in the website evidence, Angels Plus and Your Fish Stuff,[13] no longer use the term "algae wafers" either on their products or in their marketing materials. August 23, 2016 Response to Suspension Inquiry pp. 32-47; April 4, 2017 Response to Office Action pp. 42-44; November 6, 2017 Request for Reconsideration pp. 7-18.

In its reply brief, Applicant states that these decisions by competitors to stop use on these websites or on packaging is the result of its enforcement efforts.[14] 10 TTABVUE 7. However, without copies of final orders finding that "Algae Wafers" is Applicant's trademark or other evidence, this only shows that Applicant asserted claims to "Algae Wafers" and that competitors ceased use of that term, but does not shed light on its competitors' motivation for stopping their respective uses. *See In re Wella Corp.,* 565 F.2d 143, 196 USPQ 7, 8 n.2 (CCPA 1977) (evidence competitors

---

[12] According to the record, the change of name of this product was based on a settlement but no particulars were provided. April 4, 2017 Response to Office Action p. 34.

[13] Applicant also stated that Lakeway Tilapia is no longer using the term, providing a website link, not the webpage. But the Board does not consider websites for which only links are provided. *See, e.g., In re Olin Corp.*, 124 USPQ2d 1327, 1332 n.15 (TTAB 2017) ("Because the information displayed at a link's Internet address can be changed or deleted, merely providing a link to a website is insufficient to make information from that site of record.").

[14] In its appeal brief, Applicant points to web page links from the Examining Attorney's evidence and asserts that the web pages are inactive or that the producer is no longer using the term "Algae Wafers." But some of these statements are unsupported in the record. Counsel's arguments are not evidence, and we will not rely on them. *See Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1799 (Fed. Cir. 2018) (quoting *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005) ("Attorney argument is no substitute for evidence.")).

may have agreed to discontinue use of a term upon threat of legal action shows a desire by those competitors to avoid litigation, rather than distinctiveness of the term).

i) Applicant's survey evidence

Applicant commissioned an e-mail invitation secondary meaning survey from Strategic Consumer Research Inc. (SCR). *Level of Association of the Term "Algae Wafers" with the Hikari Brand. A Secondary Meaning Study,* June 17, 2014, by SCR Strategic Consumer Research Inc., August 23, 2016 Response to Suspension Inquiry pp. 55-73; April 4, 2017 Response to Office Action pp. 11-29. The survey, designed by Dr. Barry A. Sabol, President of SCR, was sent to United States consumers that were listed on a fish owners database (as provided to SCR by Survey Sampling International) requesting them to participate in a web-based survey of "secondary meaning" for Applicant's asserted ALGAE WAFERS mark. August 23, 2016 Response to Suspension Inquiry pp. 57-59. Eligible participants were those consumers who own tropical fish, were responsible for the purchase of food and supplies for tropical fish, and who had seen the term "Algae Wafers" on any food products for tropical fish. *Id.* at 58. The survey began on May 27, 2014 and concluded on May 31, 2014. *Id.* at 64.[15]

To the 1,001 qualified respondents (out of 2,271 potential respondents),[16] the survey asked:

---

[15] Applicant provided the survey in its August 23, 2016 Response to Suspension Inquiry pp. 55-73 and in its April 4, 2017 Response to Office Action pp. 11-29. It was not necessary to resubmit this evidence.

[16] Respondents (664) who did not own tropical fish or owned tropical fish but did not purchase fish food (115) did not participate nor did those respondents (472) who owned tropical fish

> "Do you associate the term 'Algae Wafers' with one company, more than one company or no company at all?"[17]; and

> "Which company or companies do you associate with the term 'Algae Wafers?'"[18]

August 23, 2016 Response to Suspension Inquiry pp. 62-63.

The results were that out of the 1001 qualified respondents, 53% (528 respondents) indicated they associated the term "Algae Wafers" with one company (single source), while 47% (473 respondents) indicated that they associated the term "Algae Wafers" with more than one company (multiple sources). *Id*. at 65. Of the 528 respondents (out of 1001 qualified respondents) who associated the term "Algae Wafers" with one company, 55% associated the term with Applicant.[19] *Id*. at 66. Of those 473 respondents who identified multiple sources for products sold under the term "Algae Wafers," 49% of respondents identified Tetra among the sources, 45% of respondents identified Applicant among the sources, and 12% of respondents could not recall a specific name. *Id*. at 67, 72. In total, thirty-nine company names were cited as companies associated with the term "Algae Wafers."[20] *Id*. at 66. The survey

---

and purchased fish food but had never seen the term "Algae Wafers" on any tropical fish food products. August 23, 2016 Response to Suspension Inquiry p. 60.

[17] No qualified survey respondents chose the "no company at all option." August 23, 2016 Response to Suspension Inquiry p. 61. This is not surprising, given that those who had never seen the term were eliminated from participation in the survey.

[18] Survey respondents did not choose from a list of companies, but filled in a blank space. August 23, 2016 Response to Suspension Inquiry p. 61.

[19] The margin of error is listed as ± 3.2% at the 95% confidence interval. August 23, 2016 Response to Suspension Inquiry p. 63.

[20] Company names provided include pet stores Petco and Petsmart, online retailer Amazon, and retailer Walmart. August 23, 2016 Response to Suspension Inquiry p. 72.

concludes that on an "overall basis 50% associated the term 'Algae Wafers' with Hikari [Applicant], 30% associated the term 'Algae Wafers' with Tetra and 11% could not cite a specific company."[21] *Id*. at 66, 72.

j) Linguistic Expert Timothy Habick, Ph.D. *The Nongeneric Nature and Secondary Meaning of the "Algae Wafers" Trademark of Hikari Sales USA, Inc.* ("Habick report") April 4, 2017 Response to Office Action pp. 31-40.

Applicant provided a report from Dr. Timothy Habick for the purpose of providing a linguistic analysis of the term "Algae Wafers" and analyzing the secondary meaning survey, conducted by SCR and designed by Barry A. Sabol, for protocol, professional standards, and evidentiary value as to genericness and distinctiveness.

Dr. Habick identifies himself as a linguist and psychometrician with 30 years of experience in the testing industry.[22] *Id*. at 33. Dr. Habick's report frames the issues as "whether 'Algae Wafers' is a generic term, and assuming that it is not a generic term, whether [the] 'Algae Wafers' … brand name has acquired secondary meaning." *Id*. at 32.

The report states that in linguistic history and contemporary culture, wafers are intended exclusively for human consumption and are typically square or rectangular

---

[21] The survey does not explain how the 50% "overall basis" figure was calculated but likely this percentage is based on the total number of qualified respondents who identified Applicant with "Algae Wafers."

[22] It is unclear what Dr. Habick's experience is in connection with evaluating trademark surveys for protocol and professional standards. Dr. Habick's testing background is in connection with the creation and review of the reasoning, verbal or content questions of examinations such as the Graduate Record Exam, the Law School Admissions Test, and the Graduate Management Admission Test. Dr. Habick has also provided linguistic and logical analysis for educational and professional purposes for professional organizations and testing companies such as the Law School Admissions Council and the Society of Clinical Research Associates. April 4, 2017 Response to Office Action p. 37.

in shape. *Id*. Circular wafers for human consumption are rare and restricted to the religious context. *Id*. The report also states that "[w]afers are traditionally made of grain flour, along with sugar, butter, salt, eggs and milk, but never algae" and that Applicant's product "is not exclusively made of algae." *Id*. This portion of the report concludes that "Algae Wafers" is neither generic nor highly descriptive of Applicant's goods because "the products are fish food, not human food," "are not shaped in traditional wafer forms," and "are not composed exclusively of algae." *Id*. at 33. Dr. Habick's report did not discuss other definitions or meanings for "wafer" nor did the report discuss Applicant's use of "wafer" or "algae" in its advertising or on packaging.[23]

As to the survey, Dr. Habick asserts that "SCR's survey instrument and survey protocol met professional standards" and the "survey questions … contain no bias, equivocation, logical tricks, imprecisions, prompting or leading language that could unfairly influence the respondents to produce answers favoring a particular outcome." *Id*. at 33. His report states that unaided recall "more precisely accesses the informants' active, psychologically operational associations," and concludes that 53% (528 out of 1001) of the respondents identifying "Algae Wafers" with only one source (or company) is strong evidence that "Algae Wafers" is not a generic term.[24] *Id*. at 34. The report also finds that the unaided identification of "Algae Wafers" with multiple

---

[23] There also was no discussion of competitor use of the terms, either separately or in combination, on advertising or packaging,

[24] The report finds it "impressive" that for those 528 respondents identifying "Algae Wafers" with one company or source, 55% (290 out of 528) identified Applicant, while only 14% identified Tetra. April 4, 2017 Response to Office Action p. 34.

companies, with Applicant being identified by a "significant percentage" of respondents, is further evidence of an association with Applicant since the only company with a higher number of unaided responses, Tetra, is no longer using the term due to a settlement agreement with Applicant.[25] *Id.* at 34.

Dr. Habick's report concludes that "the term 'Algae Wafers' is: (1) a suggestive brand name and neither highly descriptive nor generic; and (2) associated by relevant consumers with the Hikari brand at a significantly high level, to the exclusion of any other currently competing brands." *Id.* at 33-34.

III. Applicant's arguments regarding the evidence of the public's use and understanding of ALGAE WAFERS

Applicant argues that the Examining Attorney's evidence does not reflect public perception because "[m]any of the cited references" are "no longer active, have been discredited by Applicant, and are of limited or ambiguous probative value." 7 TTABVUE 14.

As indicated, Applicant introduced evidence that some third parties were no longer using the term "Algae Wafers" either on their products or in their marketing materials as a result of its policing efforts.[26] Applicant further submits that any of

---

[25] According to the report: "Tetra, the only other party identified in the survey with greater than 10% recognition in any category, no longer uses 'Algae Wafers' in connection with its fish food products, pursuant to a settlement agreement." April 4, 2017 Response to Office Action p. 34. *See also* n.7 *supra*.

[26] The Examining Attorney argues that Applicant is "over representing" the status of these web pages and submits that some of Applicant's exhibits, such as those attached to its August 23, 2016 Response to Suspension Inquiry, do not definitively prove the goods are no longer available, merely because the goods are listed as temporarily sold out or out of stock on some of the individual websites. 9 TTABVUE 9.

the other uses are "sporadic," i.e., "de minimis in nature and [ ] not sufficient" to show genericness. 7 TTABVUE 17. Applicant contends that the two newspaper stories, the one TV news story, and the one Internet webpage relating to "sucker fish" are ambiguous, and may refer to Applicant's product. Applicant also points to its consumer survey evidence and the Habick report as further evidence that "Algae Wafers" is not generic.

Applicant references the "Algae Wafers" product ingredient list and argues that its product is not a wafer made of algae, nor a product with algae as a main ingredient, but a product that is made up of many ingredients including proteins, carbohydrates, vitamins, minerals and algae. Applicant contends that this evidence shows "algae" is at most descriptive. 10 TTABVUE 6. Applicant also argues that the Board previously found in a 2007 opposition proceeding, *Salt Creek, Inc. v. Hikari Sales USA, Inc.*, Opposition No. 91158777, slip op. at 20 (TTAB March 27, 2007), that "Algae Wafers" was descriptive and not generic. *Id.* Applicant submits that it has rebutted the Examining Attorney's evidence and that the record does not support the "clear evidence" standard for genericness. 7 TTABVUE 18.

IV.    Analysis of the relevant purchasing public's understanding of the meaning of ALGAE WAFERS

The dictionary definitions of "algae" and "wafer" are probative of the public's understanding of their combination as "Algae Wafers." *See Royal Crown Co. v. Coca-Cola Co.*, 892 F.3d 1358, 127 USPQ2d 1041, 1046 (Fed. Cir. 2018) ("Evidence of the public's understanding of the term may be obtained from any competent source, such as purchaser testimony, consumer surveys, listings in dictionaries, trade journals,

newspapers and other publications.") (citation omitted); *In re Mecca Grade Growers, LLC*, 125 USPQ2d 1950, 1958 (TTAB 2018) ("These examples [dictionary definitions and industry specific evidence] clearly show the meanings that relevant consumers attribute to those words when they are used separately and when they are used together."); *see also In re Hotels.com, L.P.*, 573 F.3d 1300, 91 USPQ2d 1532, 1537 (Fed. Cir. 2009) ("the Board satisfied its evidentiary burden, by demonstrating that the separate terms 'hotel' and '.com' in combination have a meaning identical to the common meaning of the separate components"); *In re Gould Paper Corp.*, 834 F.2d 1017, 5 USPQ2d 1110, 1111-12 (Fed. Cir. 1987). But the presence or absence of "Algae Wafers" in dictionaries is not controlling on the question of whether a term is generic. *In re ActiveVideo Networks, Inc.*, 111 USPQ2d 1581, 1603 (TTAB 2014); *In re Dairimetics, Ltd.*, 169 USPQ 572, 573 (TTAB 1971); *cf. Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 114 USPQ2d 1827, 1832-33 (Fed. Cir. 2015) ("[E]ven in circumstances where the Board finds it useful to consider the public's understanding of the individual words in a compound term as a first step in its analysis, the Board must then consider available record evidence of the public's understanding of whether joining those individual words into one lends additional meaning to the mark as a whole.").

Applicant's specimen and marketing materials also are probative in indicating how the public perceives the term "Algae Wafers." *Gould*, 5 USPQ2d at 1112 (stating that generic use in reference to owner's product provided "the most damaging evidence" that the alleged mark is generic); *Mecca Grade Growers*, 125 USPQ2d at

1958 (Board considered Applicant's specimen in finding the mark descriptive and generic); *In re Empire Tech. Dev. LLC*, 123 USPQ2d 1544 (TTAB 2017) (Board considered applicant's specimen, website and promotional video in finding "Coffee Flour" generic); *cf. Real Foods Pty Ltd. v. Frito-Lay N. Am., Inc.*, 906 F.3d. 965, 128 USPQ2d 1370, 1375 (Fed. Cir. 2018) (Applicant's online marketing materials showing that corn and rice are main ingredients of the goods and advertising materials describing its goods as thin supported finding of descriptiveness of the terms "corn thins" and "rice thins"); *In re N.C. Lottery*, 866 F.3d 1363, 123 USPQ2d 1707, 1710 (Fed. Cir. 2017) ("the TTAB did not err by considering the explanatory text of the specimens in the descriptiveness inquiry"). Although Applicant argues that algae is not the only ingredient in its fish food, it is apparent that "algae" in "Algae Wafers" refers to a type of fish food. *Royal Crown*, 127 USPQ2d at 1045. Here, Applicant's specimen and brochure explain that its goods are wafer or disc-shaped, contain algae sources, and are formulated for algae eating fish.[27]

The third-party evidence from retailers and informational websites (Petco.com, freshaquarium.about.com,[28] animals.mom.me) and the evidence of use of "algae

---

[27] Applicant also seeks to rely on the prior Board opposition proceeding involving its "Algae Wafers" designation as support for non-genericness. However, that case did not involve genericness. The claims considered on final decision in the Opposition were fraud and that "Algae Wafers" was highly descriptive and lacked acquired distinctiveness. Opposition No. 91158777, slip op. at 2. In any event, the question is not whether the "Algae Wafers" designation was generic in 2007, but whether the evidence in the present record is sufficient to establish that "Algae Wafers" is generic or otherwise ineligible for registration. *In re Cordua Rests.*, 118 USPQ2d at 1635.

[28] Applicant asserts that this web page is no longer active, but we have no evidence in the record to support this assertion.

wafers" in books also reflects generic use of the term. Two of the news stories are probative of generic use as the context is not ambiguous and "algae wafers" is in lower case, consistent with generic use. *Plyboo Am. Inc. v. Smith & Fong Co.*, 51 USPQ2d 1633, 1638 (TTAB 1999); *see also Frito-Lay N. Am., Inc. v. Princeton Vanguard, LLC* 124 USPQ2d at 1184, 1190 & 1193 (TTAB 2017) (lower case references to "pretzel crisps" with no apparent reference to the term as a brand or to Applicant indicate an understanding by the relevant public that the term refers to a genus of a product rather than a single producer).

The Google search results showing use of "algae wafers" by consumers on website forums have sufficient context and reflect generic use of the term as they are in lower case letters and are used to reference fish food generally. *See generally Plyboo Am.*, 51 USPQ2d at 1638 (discussing generic third-party use); s*ee also Real Foods*, 128 USPQ2d at 1375 (purchasers of applicant's products that use the term to describe the products rather than to identify source is direct evidence of the commercial impression of the mark); *see also Frito-Lay*, 124 USPQ2d at 1190, 1193 (because business and industry publications are the work of authors who have an understanding that a brand is referenced in capital letters, use by these authors of lower case letters to reference the term "pretzel crisps" is evidence of the relevant public's understanding that the term is a genus of product, not a brand).

We find probative the generic uses of the term "algae wafers" by competitors. *Royal Crown*, 127 USPQ2d at 1048 (recognizing that indirect evidence, including "competitive use, evidence that other companies use [a term] in combination with

their own . . . marks, third-party registrations[,] and applications for such combined marks," may be relevant for genericness); *cf. Real Foods*, 128 USPQ2d at 1375 (evidence that other companies use term in combination with their own marks is relevant evidence of the terms' descriptiveness). Although there is some trademark use of the designation by competitors, more uses are non-trademark use by competitors to identify the type of fish food product. *In re Greenliant Sys. Ltd.*, 97 USPQ2d 1078, 1083 (TTAB 2010) ("examples of competitors and commentators using the term NAND drive as a category or type of product is persuasive evidence that the relevant consumers perceive the term as generic") (citing *Continental Airlines*, 53 USPQ2d at 1395).

Also, the fact that some of these competitors changed the names of their products or removed the term from marketing materials or a webpage does not convince us that the term functions as Applicant's trademark or that the public would not primarily understand "Algae Wafers" to refer to a type of fish food. *See Wella Corp.,* 196 USPQ at 8 n.2 (evidence competitors may have agreed to discontinue use of a term upon threat of legal action shows a desire by those competitors to avoid litigation, rather than distinctiveness of the term); *In re Volvo White Truck Corp.*, 16 USPQ2d 1417, 1421 (TTAB 1990) (recognizing that competitors may stop using a term to avoid a costly lawsuit rather than because they recognize the term as a trademark, particularly if there were other terms which they could use); *In re Consolidated Cigar Corp.*, 13 USPQ2d 1481, 1483 (TTAB 1989) (finding similar evidence of competitor use probative and finding evidence that three out of four

competitors agreed to discontinue use as showing merely a desire to avoid litigation rather than acknowledgement of distinctiveness of the term "whiffs").

We find Dr. Habick's linguistic analysis of the term "Algae Wafers," unreliable. We do not know the sources he used to support his conclusions regarding the meaning of "wafer." But in his analysis of the term "algae," Dr. Habick focuses on the ingredient in a wafer that is for human consumption, rather than considering algae as an ingredient in connection with fish food, the relevant goods. *Cf.* Fed. R. Civ. P. 702; *i4i Ltd. v. Microsoft Corp.*, 598 F.3d 831, 854 93 USPQ2d 1943 (Fed. Cir. 2010) ("Rule 702 [is a] safeguard[] against unreliable or irrelevant opinions"); *Microstrategy Inc. v. Business Objects S.A.*, 429 F.3d 1344, 77 USPQ2d 1001, 1008 (Fed. Cir. 2005) (district court has the responsibility to exclude an expert opinion that overlooks factors that render the testimony unreliable and/or speculative); *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 116 USPQ2d 1637, 1646 (Fed. Cir. 2015) (discussing Federal Rules of Evidence 702 and 703, and stating "district court may exclude evidence [expert testimony] that is based upon …unreliable principles or methods, legally insufficient facts and data, or where the reasoning or methodology is not sufficiently tied to the facts of the case."). Dr. Habick did not explain why he did not consider in his analysis other definitions or meanings for "wafer," including those referencing a disc shape. Dr. Habick also did not consider Applicant's own advertising and promotional materials which describe the goods as having a disc shape, containing algae, and for algae eaters; nor did Dr. Habick consider any third-party use. Moreover, there is no evidence suggesting that Dr. Habick is a trademark

expert, and his opinion as to whether "Algae Wafers" is suggestive, descriptive or generic is not entitled to any weight. *See Anheuser-Busch Inc. v. Holt*, 92 USPQ2d 1101, 1106 (TTAB 2009) ("the opinion offered by Professor Ward as to the descriptiveness of applicant's 'BEER 1,' 'ONE BEER, BEER 1' and 'BEER 1 MMVII and design' marks, as opposed to any factual matters within his area of linguistic expertise or personal knowledge, is of virtually no probative value in this case"); *Ferro Corp. v. Nicofibers, Inc.*, 196 USPQ 41, 45 (TTAB 1977) (purchasers' "understanding of the marks must be determined in light of the relevant purchasing sector and not that of linguistics experts or those familiar with the meaning or derivation of words").

We have also considered Dr. Habick's opinion regarding the survey design and methodology conducted by another entity. Dr. Habick's opinion, however, cannot substitute the . . . for the ultimate decision to be reached by the [Board]." *Quaker Oats Co. v. St. Joe Processing Co.*, 232 F.2d 653, 109 USPQ 390, 391 (CCPA 1956).

Turning back to the survey evidence itself, Applicant points to the over 50% recognition rate of Applicant in the survey to argue that "Algae Wafers" is not generic and has acquired distinctiveness.[29]

First, in keeping with the findings of other circuits, we have found that for assessing genericness, consumer surveys "are only appropriate to consider in a case where the question is whether a coined or arbitrary mark has become generic, and is

---

[29] Applicant argues that the secondary meaning survey can also be considered for genericness because it addresses whether the respondents identify "Algae Wafers" with one source or multiple sources. As a general matter, evidence going to secondary meaning is irrelevant to the question of genericness. *In re Northland Aluminum Products, Inc.*, 777 F.2d 1556, 1560 (Fed. Cir. 1985).

not appropriate to prove recognition of an otherwise not inherently distinctive mark." *Frito-Lay*, 124 USPQ2d at 1196 (citing *Hunt Masters, Inc. v. Landry's Seafood Restaurant, Inc.* 240 F.3d 251, 57 USPQ2d 1884, 1886 (4th Cir. 2001); *Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990, 203 USPQ 642, 647 (7th Cir. 1979); *Schwan's IP, LLC v. Kraft Pizza Co.*, 460 F.3d 971, 79 USPQ2d 1790, 1794 (8th Cir. 2006)); *see also National Nonwovens, Inc. v. Consumer Prods. Enters., Inc.*, 397 F. Supp. 2d 245, 78 USPQ2d 1526, 1533 (D. Mass. 2005) (citing *Hunt Masters*) (in ruling for defendant on summary judgment and finding plaintiff's asserted mark to be generic, court found survey by plaintiff at trial would be "unnecessary" since plaintiff's asserted mark was not a coined term). There are two types of generic terms: those that name the product or service in ordinary English, and those that originated as distinctive brand names but became generic over time. Only in the latter case are consumer surveys relevant. Surveys might help in determining whether a designation that started life as a mark now is understood to be the thing itself, but they can have no probative value where the issue is the meaning of terms as a lexical matter. Where, as here, the question is not whether a term has become generic through common use, consumer surveys are not relevant.[30] *Frito-Lay*, 124 USPQ2d at 1196; *accord Hunt Masters,* 57 USPQ2d at 1886 (4th Cir. 2001).

---

[30] To the extent the survey shows consumers viewing the mark as a source indicator, even in such circumstances where a term is a generic designation as demonstrated by the evidence of record, it is not entitled to protection because it would "deprive competing manufacturers of the product of the right to call an article by its name." *Continental Airlines*, 53 USPQ2d at 1395 (citation omitted).

But even if we were to consider the survey in the context of the genericness refusal,[31] we find that it would be entitled to very little weight in view of the following issues. The survey calculates on an "overall basis" a 50% association with Applicant (i.e., based on presumably a combined figure for those respondents who identified "Algae Wafers" with one source or with multiple sources). But, of the over 47% of the qualified 1001 respondents that identified "Algae Wafers" with multiple sources, the source most identified with the designation was not Applicant.[32] August 23, 2016 Response to Suspension Inquiry pp. 72.

- Among those who indicated that they associated the term "Algae Wafers" with multiple sources:
    - 49% cited Tetra
    - 45% cited Hikari
    - 12% could not recall a specific name
    - 9% cited Wardley's
    - 8% cited Petco
    - 6% cited PetSmart
    - 6% cited API

    while no other company (source) was cited by more than 4% of respondents.

*Id*. at 67.

Second, the survey also is flawed because there is no indication that there was a control group or that pre-testing was performed, and we do not know whether survey

---

[31] The Federal Circuit has indicated that "surveys that are conducted within five years of the relevant date may provide evidence of secondary meaning" while surveys that are older than five years may be considered relevant if there is evidence that such uses were likely to have impacted consumers' perceptions of the mark as of the relevant date. *Converse, Inc. v. ITC*, 907 F.3d 1361, 128 USPQ2d 1538, 1547 (Fed. Cir. 2018) (citing *Royal Crown*, 127 USPQ2d at 1049). In this case, the survey was conducted in 2014, shortly before the case was suspended for civil litigation, making it nearly three years old when it was submitted.

[32] As indicated in n.25 *supra*, according to Dr. Habick's report, Tetra is no longer using the designation due to a settlement with Applicant. *See also* n.7 *supra*.

participants actually understood what they were being asked. *See* David H.B. Bednall et al., *Color, Champagne and Trademark Secondary Meaning Surveys: Devilish Detail*, 102 TRADEMARK REP. 967, 999 (2012) ("As with all questionnaires, some form of pre-testing is necessary to check that all contentious questions are understood and that problems with administration are identified."); *see also, e.g.*, *T-Mobile U.S. Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888 (S.D. Tex. 2014) (secondary meaning survey included control group and survey results were adjusted based on those responses).[33] In this case, it is apparent that at least some respondents believed the question was asking the retail source for the fish food, rather than the producer, as answers from qualified respondents included Petco, Petsmart, Walmart, Amazon, Home Depot, and Petworld. August 23, 2016 Response to Suspension Inquiry pp. 72-73.

The survey asked consumers whether they "associated" the term "Algae Wafers" with one or more companies. But the survey does not adequately reveal the nature of the association a consumer perceives between "Algae Wafers" and Applicant Hikari and the other companies identified, as there were no follow-up questions inquiring as to the reason for identifying Hikari, or another company that would establish what

---

[33] In this case, the questions about association of the term "algae wafers" were not slanted or leading. But the question did not filter out "noise" or guessing on the part of respondents. *See, e.g., Am. Basketball Ass'n v. AMF Voit, Inc.,* 358 F. Supp. 981, 177 USPQ 442, 446 (S.D.N.Y. 1973) (in secondary meaning pilot survey, the court adjusted downward the actual number of consumers who associated the red, white and blue basketball with the ABA by the 18% guess factor from the control group). Here, there was no control group and no follow-up question to determine why a respondent provided a particular response. The survey also does not explain how adjustments were made to the results to address respondents who could not recall any specific name in connection with "algae wafers" (11% of respondents for those who associated "algae wafers" with one company and 12% of respondents who associated algae wafers with multiple companies).

the respondent understood. *See Royal Crown*, 127 USPQ2d at 1049 (a survey may be insufficient to evidence the relationship between the term and its source; a survey question asking whether the consumer associated the term ZERO with one company or many companies was found insufficient "to demonstrate the public's perception of the term ZERO; association does not imply that a consumer would be confused by seeing a ZERO branded product under a different label, nor does it address what meaning consumers attach to the term ZERO"); *Autodesk Inc. v. Lee*, 113 USPQ2d 1161, 1163-64 (E.D. Va. 2014) (phone survey asking respondents whether they "associate the name or term 'DWG' with design software from any particular company or companies" found insufficient to demonstrate secondary meaning); *British Seagull Ltd. v. Brunswick Corp.*, 28 USPQ2d 1197, 1202 (TTAB 1993) (survey asking respondents whether they associated the color black with one particular company failed to establish secondary meaning); *see also* Bednall et al., 102 TRADEMARK REP. at 997 ("Just because a particular indicium is strongly associated with a brand does not mean that it serves to identify the source. . . . Hence a test of secondary meaning as measured by a question asking about 'association' may be insufficient to evidence the relationship between the symbol and its source.").

Finally, the proper universe was not surveyed. Although the goods are broadly identified as "fish food," the survey was narrowed to those respondents that purchase fish food for tropical fish in households where tropical fish are owned. Therefore, the survey universe was too narrow because it did not include people who purchase fish food for fish other than tropical fish. *See Omaha Steaks Int'l, Inc. v. Greater Omaha*

*Packing Co.*, 908 F.3d 1315, 128 USPQ2d 1686, 1692 (Fed. Cir. 2018) (where identification of goods broadly identified goods as meat and beef, survey universe too narrow because it eliminated from survey meat eaters who buy their meat from sources other than plaintiff); *In re FCA US LLC*, 126 USPQ2d 1214, 1226 (TTAB 2018) (survey was of limited relevance because it did not consider the entire universe of customers for automobiles, trim and structural parts but was limited to customers for vehicles capable of off-road driving); *Sheetz of Del., Inc. v. Doctor's Assocs. Inc.*, 108 USPQ2d 1341, 1363 n.41, 1371 (TTAB 2013) (finding survey universe too narrow and stating "[b]ased on the description of goods, the proper survey universe should include all people who purchase and eat sandwiches (defined to exclude only hot dogs)"; "[t]here may be an overreliance on patrons of 'fast food' establishments that skews the results because the proper universe is all consumers who purchase and eat sandwiches.").[34]

Also, the survey may have been skewed towards Applicant by eliminating from the qualified respondents those who had not seen the term "Algae Wafers" on any food products for tropical fish but owned or cared for tropical fish and purchased food

---

[34] *But see Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 221 USPQ 536 (11th Cir. 1983) (survey universe of participants and spectators at organized track meets considered too narrow to fairly represent the opinions of consumers of athletic footwear) (quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 205 USPQ 969, 979 (5th Cir. 1980) ("The appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services."); *see also Weight Watchers Int'l Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 19 USPQ2d 1321, 1331 (S.D.N.Y. 1990) ("Flaws in a study's universe quite seriously undermine the probative value of the study, because to be probative and meaningful ... surveys ... must rely upon responses by potential consumers of the products in question.") (citations omitted).

for them.[35] *See Omaha Steaks Int'l*, 128 USPQ2d at 1692 (intentionally eliminating a large segment of meat eaters and directing survey to a narrow universe of respondents exclusively comprised of plaintiff's customer base skewed results); *Sno-Wizard Mfg., Inc. v. Eisemann Prods. Co.*, 791 F.2d 423, 230 USPQ 118, 120-21 (5th Cir. 1986) (discrediting high recognition of product configuration because majority of respondents already used the product); *I.P. Lund Trading ApS v. Kohler Co.*, 118 F. Supp. 2d 92, 56 USPQ2d 1776, 1789 (D. Mass. 2000) (where consuming public limited to prospective purchasers of high-end lavatory fittings, including members of the interior design and architectural trade, the narrowing of respondents to eliminate those from secondary meaning survey who could not identify the VOLA faucet by sight "stacks the deck in Lund's favor"); *Paco Sport Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 54 USPQ2d 1205, 1221 n.17 (S.D.N.Y. 2000) (limiting survey universe to exclude fragrance purchasers unaware of PACO RABANNE products was inappropriate; all prospective purchasers should have been included); *ProMark Brands Inc. v. GFA Brands, Inc.*, 114 USPQ2d 1232, 1248 (TTAB 2015) (survey that "excluded potential purchasers of SMART BALANCE frozen meals who were unaware of SMART ONES products" skewed the results of the survey "by preventing those individuals least likely to be confused from participating").

a) Conclusion as to Genericness

---

[35] As noted in n.17*supra*, there were no qualified respondents who chose the "no company at all option," but that is because the survey was narrowed to only those respondents who had seen the term "algae wafers" on fish food. See n.16 *supra*.

The combination of the two words "algae" and "wafers" results in a designation that has a plain and readily understood meaning as a type of fish food in wafer form containing algae. *Royal Crown*, 127 USPQ2d at 1044 ("if the public understands ZERO when used in combination with a designated beverage name to refer to a sub-group or type of beverage that carries specific characteristics, that would be enough to render the term generic"); *cf. Real Foods,* 128 USPQ2d at 1375 (finding "corn thins" and "rice thins" merely descriptive of the quality or characteristics of the products, specifically, the main ingredients and thickness of the crisp bread slices). While there are some trademark uses of the term "Algae Wafer," overwhelmingly the references are in a generic manner. The uses of "Algae Wafer" in books, by third-parties, consumers, and competitors reflect use as a common name for a type of fish food for algae eating fish. In view of the foregoing, we find that the Examining Attorney's burden of proof has been satisfied in proving that the term "Algae Wafers" is generic when used in connection with "fish food." Because the term "Algae Wafers" is generic when used in connection with the goods in the application, it is not registrable on the Principal Register under the provisions of Section 2(f).[36]

V.   Mere Descriptiveness and Lack of Acquired Distinctiveness

For completeness, we address the alternative refusal that "Algae Wafers" is merely descriptive and has not been shown to have acquired distinctiveness. Although we have found the mark to be generic, for purposes of the acquired

---

[36] The designation also is not registrable on the Supplemental Register in view of our finding of genericness.

distinctiveness refusal we presume that it is descriptive, in light of Applicant's resort to Section 2(f) of the Trademark Act. *See Cold War Museum, Inc.*, 92 USPQ2d at 1629.

"To show that a mark has acquired distinctiveness, an applicant must demonstrate that the relevant public understands the primary significance of the mark as identifying the source of a product or service rather than the product or service itself." *In re Steelbuilding.com*, 415 F.3d 1293, 75 USPQ2d 1420, 1422 (Fed. Cir. 2005); *see also Coach Servs., Inc. v. Triumph Learning LLC,* 668 F.3d 1356, 101 USPQ2d 1713, 1729 (Fed. Cir. 2012). "The applicant … bears the burden of proving acquired distinctiveness." *In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 1335 (Fed. Cir. 2015).

In determining whether Applicant has demonstrated acquired distinctiveness of the proposed mark for its goods, we examine the evidence of record as it relates to six categories of facts that are evaluated together: (1) association of the mark with a particular source by actual purchasers (typically measured by customer surveys); (2) length, degree, and exclusivity of use; (3) amount and manner of advertising; (4) amount of sales and number of customers; (5) intentional copying; and (6) unsolicited media coverage of the product embodying the mark. *Converse, Inc. v. ITC*, 909 F.3d 1110, 128 USPQ2d 1538, 1546 (Fed. Cir. 2018); *In re SnoWizard, Inc.*, 129 USPQ2d 1001, 1005 & n.8 (TTAB 2018) (holding *Converse* applicable to Board proceedings).[37]

---

[37] Although the *Converse* decision was issued after the briefing of this ex parte appeal was completed, the clarification of the Section 2(f) factors enunciated by the Federal Circuit does not alter our analysis in any significant way, require any additional briefing by Applicant or the Examining Attorney, nor affect the ultimate resolution of this ex parte proceeding. *SnoWizard*, 129 USPQ2d at 1005 n.8.

No single factor is determinative. *Converse*, 128 USPQ2d at 1548 (citing *In re Steelbuilding*, 75 USPQ2d at 1424); *In re Tires, Tires, Tires Inc.*, 94 USPQ2d 1153, 1157 (TTAB 2009); *see also In re Ennco Display Sys. Inc.*, 56 USPQ2d 1279, 1283 (TTAB 2000) ("Direct evidence [of acquired distinctiveness] includes actual testimony, declarations or surveys of consumers as to their state of mind. Circumstantial evidence, on the other hand, is evidence from which consumer association might be inferred, such as years of use, extensive amount of sales and advertising, and any similar evidence showing wide exposure of the mark to consumers.").

### A. Degree of Descriptiveness

We begin by assessing the degree of descriptiveness because that bears on the sufficiency of the evidence required to prove acquired distinctiveness. *See, e.g., Royal Crown*, 127 USP2d at 1048 ("[H]igher levels of descriptiveness require a more substantial showing of acquired distinctiveness."); *Real Foods*, 128 USPQ2d at 1378 (same); *In re Steelbuilding.com*, 75 USPQ2d at 1424 ("[A]pplicant's burden of showing acquired distinctiveness increases with the level of descriptiveness; a more descriptive term requires more evidence of secondary meaning."); *In re Bongrain Int'l Corp.*, 894 F.2d 1316, 13 USPQ2d 1727, 1727 n.4 (Fed. Cir. 1990) (quoting *Yamaha Int'l*, 6 USPQ2d at 1008 ("the greater the degree of descriptiveness the term has, the heavier the burden to prove it has attained secondary meaning")); *In re Tires, Tires, Tires Inc.*, 94 USPQ2d at 1157 (highly descriptive terms are less likely to be perceived

as trademarks, and therefore more persuasive evidence of secondary meaning will ordinarily be required to establish their distinctiveness).

In this case, we find that the designation "Algae Wafers" is highly descriptive of fish food. The record establishes that the wording directly and immediately identifies significant features of the goods without requiring thought or imagination to discern the nature of the goods. In fact, "algae wafers" are in wafer form, contain algae, and are for algae eaters. *See, e.g.*, *Real Foods*, 128 USPQ2d at 1374-75 ("Substantial evidence supports the TTAB's finding that the proposed marks are highly descriptive. The terms 'corn' and 'rice' … describe the primary ingredient in Real Foods' respective goods …. Moreover, the term thins describes physical characteristics of the corn and rice cakes."). We therefore, for purposes of the acquired distinctiveness inquiry, find the mark to be highly descriptive. Given the term's highly descriptive nature, Applicant has a higher burden to establish acquired distinctiveness. *See, e.g.*, *In re Steelbuilding.com*, 75 USPQ2d at 1424 ("the applicant's burden of showing acquired distinctiveness increases with the level of descriptiveness; a more descriptive term requires more evidence of secondary meaning.") (citation omitted).

B.    Evidence of Acquired Distinctiveness

We now consider Applicant's evidence of acquired distinctiveness, some of which was previously set forth in the genericness discussion. We have considered all of the evidence relevant to assessing the public perception of this designation.

1)  Consumer survey and Habick report

Consumer surveys can, when conducted properly, be a form of direct evidence of acquired distinctiveness.[38] *E.g.*, *Schlafly v. Saint Louis Brewery, LLC*, 909 F.3d 420, 424, 128 USPQ2d 1739, 1743 & n.2 (Fed. Cir. 2018). Here, Applicant's survey is entitled to little probative weight given the various deficiencies discussed earlier, and for reasons already discussed, we also find the Habick report's conclusion that "Algae Wafers" has acquired distinctiveness is entitled to little, if any, probative weight.

2) Applicant's marketing activities

Marketing activities may provide circumstantial, i.e., indirect, evidence of acquired distinctiveness. *See, e.g.*, *Tone Bros. v. Sysco Corp.*, 28 F.3d 1192, 31 USPQ2d 1321, 1328, 1329 (Fed. Cir. 1994). Applicant has used "Algae Wafers" continuously since at least October 31, 1991 and actively advertised its goods sold under the proposed mark since at least October 1992. Response to Suspension Inquiry, August 23, 2016 (Clevers declaration), p. 2. Applicant spent $187,765 advertising in magazines and trade publications and $290,000 on Internet advertising between November 1, 2010 and October 31, 2015. Applicant has promoted "Algae Wafers" at trade shows. *Id*. at 3.[39] Applicant spent $830,270 between

---

[38] Although Courts have found that consumer association of 50% is sufficient to establish acquired distinctiveness, 6 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32.190 (5th Ed. November 2018 update), as discussed, the SCR survey suffers from numerous flaws, including an improper universe, designed to enhance recognition.

[39] Applicant did not indicate what other products were also promoted at these trade shows but the evidence shows that Applicant offers a variety of fish food products. For example, Applicant also offers sinking wafers, food sticks, and micro pellets which are advertised together with "Algae Wafers." August 23, 2016 Response to Suspension Inquiry pp. 2, 6, 12, 15-26 (Clevers Declaration). Nearly all of the advertisements in the record show Applicant's "Algae Wafers" product advertised with Applicant's other fish food products.

November 1, 2006 and April 30, 2016 in connection with trade shows with $448,208 of that amount spent between May 1, 2011 and April 30, 2016. *Id.*

Particularly in light of, at a minimum, the highly descriptive nature of "Algae Wafers," Clevers' declaration testimony alone does not convince us that ordinary purchasers of fish food have come to view that term primarily as an indicator of source. *See SnoWizard*, 129 USPQ2d at 1006 (length of use of mark for over nine years insufficient by itself to bestow acquired distinctiveness); *Target Brands, Inc. v. Hughes*, 85 USPQ2d 1676, 1681 (TTAB 2007) ("Applicant's continuous use since 1992 is a fairly lengthy period, but not necessarily conclusive or persuasive on the Section 2(f) showing."); *In re Kalmbach Publ'g Co.*, 14 USPQ2d 1490, 1494 (TTAB 1989) (for highly descriptive term, applicant's statement of long use of a purported mark was insufficient to establish distinctiveness, absent specific evidence of the extent of the mark's exposure to the purchasing public and of the purchasers' perception of the asserted mark).

The Clevers declaration provided examples of Applicant's advertisements showing Applicant's "Algae Wafers" product. These advertisements show that the "Algae Wafers" product is displayed with other fish food products offered by Applicant:



August 23, 2016 Response to Suspension Inquiry pp. 19, 20, 22.



August 23, 2016 Response to Suspension Inquiry p. 23.



August 23, 2016 Response to Suspension Inquiry p. 25.[40]

---

[40] Additional advertisements of a similar nature not displayed here are in the record. *See generally* August 23, 2016 Response to Suspension Inquiry pp. 15-18, 21, 24, 26.

The Clevers declaration provided dollar amounts related to Applicant's advertising and promotional expenditures. Applicant spends an annual average of $95,553 on print and Internet advertising.[41] Although Applicant provides some context for its advertising and promotional expenditures, we lack sufficient information as to whether the amounts stated are significant in the industry. *Cf. Mini Melts, Inc. v. Reckitt Benckiser LLC*, 118 USPQ2d 1464, 1480 (TTAB 2016) (probative value of sales revenue figures quantified as doses sold is diminished by the fact that the amount is just a raw number without context as to applicant's market share or whether this amount is significant in the industry). In other cases, annual advertising expenditures of $100,000 or less have been considered relatively modest for a highly descriptive designation. *See Apollo Med. Extrusion Techs.,* 123 USPQ2d at 1856 (finding $75,000 for one year of advertising and promotion expenditures "hardly impressive, falling far below levels deemed persuasive in other cases involving the acquired distinctiveness of marks that may be highly descriptive"); *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 10 USPQ2d 1443, 1447 (6th Cir. 1989) (finding $100,000 for one year's advertising expenditures did not evidence secondary meaning in "Appalachian Log Structures" for log houses without additional evidence "to establish the amount as extensive or to distinguish it as beyond that necessary to survive in the market").

---

[41] From the Clevers declaration, the total 2010-2015 print and Internet advertising expenditures are $477,765.

Significantly, as shown above, the advertisements that include "Algae Wafers" also feature other products Applicant sells under different names, thus diluting how much of the advertising spending should be counted toward building consumer awareness of "Algae Wafers."

Likewise, although Applicant spent $448,208 for trade shows between 2011 through 2016, and $830,270 for a 10-year period between 2006 through 2016, we do not know if these expenses include the promotion of Applicant's other fish food products. Thus, it is uncertain how much of the advertising and trade show expenses are allocated to products sold under the "Algae Wafers" designation. *AS Holdings, Inc. v. H & C Milcor, Inc.*, 107 USPQ2d 1829, 1838 (TTAB 2013) (advertising expenditures entitled to little weight because figures provided are for advertising expenditures that "include pipe boots" and not pipe boots alone); *Target Brands,* 85 USPQ2d at 1681 ("[I]n his catalogs and Internet website advertisements, applicant displays numerous products under a variety of marks … in addition to the ULTIMATE POLO product. … it is uncertain how much of the catalog and advertising expenses are allocated to products sold under ULTIMATE POLO.").

Applicant did not provide circulation figures for the publications in which Applicant's advertisements appeared, nor did Applicant elaborate on the nature of its Internet advertising (e.g., website, banner ads), or its effectiveness, such as unique visitors to a website or click-through rate for banner ads. *See In re Steelbuilding.com*, 75 USPQ2d at 1426 (discussing weight to be given Internet advertising). The record also is devoid of information regarding the number of visitors to Applicant's booth at

trade shows. As a result, the advertising and promotional figures lack information indicating the extent of consumer exposure and any resulting impact on consumer perception. *See In re Gibson Guitar Corp.*, 61 USPQ2d 1948, 1953 (TTAB 2001) (Board could not determine "what kind of exposure, and hence impact," advertising materials had absent evidence of the extent of distribution of the materials) *cf*. *SnoWizard*, 129 USPQ2d at 1006 (Board could not "glean any meaningful information from these sales figures since Applicant failed to submit any evidence regarding the cost of each of its concession trailers, how many consumers have purchased Applicant's concession trailers, or how many trailers it sold per year"). Notwithstanding over twenty-six years of use, the Clevers declaration did not offer any sales figures.[42] "Thus, we are at a disadvantage to accurately gauge the degree of exposure and the achievement of distinctiveness among the relevant classes of purchasers." *Apollo Med. Extrusion Techs.*, 123 USPQ2d at 1855-56. While there is no question that Applicant has spent money to promote its product under the designation "Algae Wafers," in sum, the record falls far short of establishing that Applicant's promotional efforts have borne fruit with respect to acquired distinctiveness. *Id.* at 1856; *see also Mini Melts,* 118 USPQ2d at 1480 *("*The ultimate test in determining whether a designation has acquired distinctiveness is Applicant's success, rather than its efforts, in educating the public to associate the proposed mark with a single source.").

---

[42] The Clevers Declaration indicates that Applicant has been "consistently" advertising its goods since October 1992. August 23, 2016 Response to Suspension Inquiry p. 2.

We find that Applicant has failed to establish that the designation "Algae Wafers" has acquired distinctiveness as a source-indicator for Applicant's fish food. That is, Applicant has not established that, "in the minds of the public, the primary significance of [Algae Wafers] is to identify the source of the product rather than the product itself." *Coach Servs.*, 101 USPQ2d at 1729. Rather, the record establishes that the wording is, at a minimum, a highly descriptive designation that identifies significant features of the goods, namely, Applicant's goods are fish food in a wafer shape that contain algae and are fed to algae eaters. The evidence of acquired distinctiveness must be weighed against the highly descriptive nature of the wording "Algae Wafers." Given that the designation is highly descriptive, much more persuasive evidence than Applicant has submitted would be necessary to show that "Algae Wafers" has become distinctive as a source indicator for Applicant's fish food. *Cf. In re Boston Beer Co. L.P.*, 198 F.3d 1370, 1371 (Fed. Cir. 1999) (even where there was evidence of "annual advertising expenditures in excess of ten million dollars and annual sales under the mark of approximately eighty-five million dollars," the Court held that, "considering the highly descriptive nature of the proposed mark, [the applicant] has not met its burden to show that the proposed mark has acquired secondary meaning").

The refusal to register based on lack of acquired distinctiveness is affirmed.

VI. Request for Remand

In its appeal brief, Applicant for the first time requests remand to the Examining Attorney for amendment to the Supplemental Register "if the Board concludes that

the mark is not generic but that Applicant has not met its burden under Section 2(f)." 7 TTABVUE 21. Applicant's request cannot be granted for two reasons. First, our finding that the proposed mark is generic bars registration on the Supplemental Register. Second, Applicant's request to seek registration on the Supplemental Register is untimely. See Trademark Rule 2.142(g) ("An application which has been considered and decided on appeal will not be reopened except for the entry of a disclaimer ... or upon order of the Director"). Had Applicant wished to argue registrability on the Supplemental Register in the alternative, it should have raised that issue prior to appeal, or sought a remand for good cause prior to final decision. *See, e.g.*, *In re Integrated Embedded*, 120 USPQ2d 1504, 1512 (TTAB 2016) (rejecting an applicant's remand request on appeal to amend to the Supplemental Register as an untimely amendment "that should have been made during prosecution"). Accordingly, Applicant's request that we remand for amendment to the Supplemental Register is denied.

**Decision**: The refusal to register Applicant's proposed mark ALGAE WAFERS is affirmed as to genericness and on the basis that the mark is highly descriptive and Applicant has not demonstrated the mark has acquired distinctiveness.